**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――――――――――

d/b/a **SEAPORT HOUSE (HOPKINS HAWLEY LLC),**
**THE GREATER NEW YORK MERCHANTS' ALLIANCE,**
and **COSTIN TARSOAGA,**
On behalf of themselves and all others similarly situated,

|  |  |
|---|---|
| | **VERIFIED**<br>**COMPLAINT** |
| | **CIVIL ACTION FOR**<br>**DEPRIVATION OF**<br>**RIGHTS**<br>**(42 U.S.C. § 1983)** |

*Plaintiffs,*

**Case No.:**

**JURY TRIAL**
**DEMANDED**

-*against*-

**ANDREW CUOMO,** in his personal and official capacity as
Governor of the State of New York, **THE NEW YORK CITY**
**DEPARTMENT OF FINANCE, THE NEW YORK CITY**
**SHERIFF'S DEPARTMENT,** and **MAYOR De BLASIO,** in
his personal and official capacity as Mayor of The City of
New York,

*Defendants.*

―――――――――――――――――――――――――――――――――――

**CLASS ACTION COMPLAINT FOR CIVIL RIGHTS**
**<u>VIOLATIONS AND INJUNCTIVE RELIEF</u>**

1.      This action is brought by Representative Plaintiffs, d/b/a SEAPORT

HOUSE (HOPKINS HAWLEY LLC), THE GREATER NEW YORK MERCHANTS' ALLIANCE,

and COSTIN TARSOAGA (the "Plaintiffs"), on behalf of themselves and others

who are similarly situated, for various unprecedented and incontestably egregious Constitutional violations including deprivation of fundamental liberty interests, due process rights, and because the Plaintiffs, and those similarly situated, are being deprived of their **CORE** liberty rights as a result of Governor Cuomo and Mayor De Blasio having failed to devise and apply the _Least Restrictive Means_[1] in our collective battle to confront the pandemic.

### _Statement of Facts_

2.      Plaintiffs, and those who are similarly situated, have taken a more sustainable, science backed, approach to managing the pandemic than the Governor and Mayor. While attempting to safely maintain their businesses and continue to provide income for countless families, the efforts of Plaintiffs and others similarly situated, have led to significant advancements towards the ultimate goal of eliminating the transmission of the virus in restaurants and other similar venues by improving ventilation and air flow while rigidly enforcing certain operational protocols.

3.      Considerable financial resources and time have been invested into these efforts with little to no notice or interest from the Governor or Mayor De

---

[1]  _McCutcheon v. Fec_, 134 S. Ct. 1434 (2014) (This test is part of the "strict scrutiny" applied by the courts to a law that restricts First Amendment or other fundamental constitutional rights. To pass the test, a law must use the least restrictive means possible to achieve the alleged compelling state interest).

Blasio. The Least Restrictive Means of managing the growing positivity rates of the virus can be developed through a working partnership between the private and government sectors of the State. Instead of engaging with the business and medical communities with the goal of developing a sustainable approach to mitigating the spread of the virus, the Governor continues to respond to the pandemic with knee jerk responses that only serve to keep an already emotionally frayed citizenry in a never-ending state of fear and paranoia and, as well, actually is the proximate cause of more spread and deaths related to the pandemic.

4.    The Governor's Executive Orders and restrictions looming over the heads of business owners, workers, and consumers — a constant reminder that businesses, income, gatherings, education, worship and most other liberties and rights can now be taken away at any time — at the sole and uncontrollable discretion — of a single state actor, without due process of law or procedural remedy whatsoever. Plaintiffs and others similarly situated have suffered irreparable harm because of these constant threats to their livelihoods and businesses at the Governor's and Mayor's whim, which constitutes irreparable harm.[2]

---

[2]   *Tom Doherty Associates, Inc. v. Saban Enter*, 60 F.3d 27, 37 (2d Cir. 1995) ("We have found irreparable harm where a party is threatened with the loss of a business.")  *Sunni, LLC v. Edible Arrangements, Inc.*, 14

5.    The Governor has shown no proclivity towards working with the business communities or receiving the message from the greater medical community, who have the stated goal of creating and implementing a set of science backed protocols that will protect workers and customers while rebuilding our State's economy. This type of collective effort would give New Yorkers a sense of hope where currently, there is extraordinarily little to none.

6.    A recent front page article from the New York Post depicted Governor Cuomo in green face and a *Santa Claus* outfit, as the Grinch, entitled, "***You're a Mean One: Cuomo the Grinch Who Stole Christmas as he Bans Indoor Dining (again)***."[3] The article illustrates the feelings that most New Yorkers have towards the Governor since the pandemic started: that the Governor has no interest in guiding the State back to some semblance of normalcy and that he doesn't care how devastating his Executive Orders are — in practice — on the people that he is sworn to serve and displays a profound disconnect two protections of the United States Constitution and the people:

---

Civ. 461 (KPF), at *24 (S.D.N.Y. Mar. 25, 2014) ("Loss of a business can constitute irreparable harm.") *United Retail Incorporated v. Main Street Mall Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995) ("A threat to trade or business viability may constitute irreparable harm").

[3] New York Post (December 12, 2020).



7.     The Governor's Orders are an unconstitutional deprivation of liberty and property without due process of law as incorporated to apply to the states and its citizens through the United States Bill of Rights.

8.     This action further arises because the variegated executive branch orders, arbitrarily dictated by Governor Cuomo and Mayor De Blasio, are manifestly illegal and unprecedented in both law and equity, for any governmental entity that would call itself a democracy and/or espouses the idea of freedom and liberty; as the legislature cannot, and must not be able to, delegate its core decision making authority to an executive. Further, aspects of

the Governor's Executive orders drastically affects interstate commerce which can only be regulated by the federal government *via* the *Dormant Commerce Clause*.

9.    The Governor's Executive Orders are a violation of the 42 U.S.C. § 1983 mandates because they deprive Plaintiffs and others similarly situated from Constitutionally protected rights, without the benefit of due process.

10.    Finally, the Governor has illegally infringed on the right of the people to peacefully assemble and protest their government pursuant to the First Amendment of the United States Constitution.

11.    The proposed class Plaintiffs consist of a group of United States civilians and New York City merchants who cannot, and will not, respect or obey any further takings of our fundamental liberty interests and freedoms.

12.    We are prepared to work with the Governor to define and "prove" the efficacy of the scientifically proven measures that Plaintiffs and others similarly situated have implemented while working towards developing sustainable ventilation and operational protocols that can be implemented across the State and the Country to safely mitigate the spread of the virus.

13.    However, we are also prepared to confront the Governor, the New York City Sheriff's Office, and any entity that chooses to rescind our democratic

rights, by employing means which include mass protests and gatherings, civil disobedience, and more, in order to live free according to our birth rights. Accordingly, we begin by asking for the protection of the federal courts as we proceed with our noble and just endeavor.[4]

**NEW YORK EXECUTIVE ORDERS**

14.    New York State Executive Law § 29(a) Of Article 2(b) authorizes the issuance of executive orders with all the authority of a law introduced and enacted through traditional processes for as long as the executive order remains in effect. However, executive orders are subject to the state constitution, the federal constitution as well as federal statutes and regulations and, of course, the will of the people in a country which ventures to democratic.

15.    The case at bar arises because of Governor Cuomo's issuance of Executive Order 202.81, styled *"Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency,"* which states in relevant part:

The directive contained in Executive Order 202.61 as

---

[4]    Roman Catholic Diocese Of Brooklyn, New York V. Andrew M. Cuomo, Governor Of New York: On Application For Injunctive Relief: November 25, 2020: Cite as: 592 U. S. ____ (2020) 1: *Per Curium*: SUPREME COURT OF THE UNITED STATES: No. 20A87 ("But even in a pandemic, the Constitution cannot be put away and forgotten ***[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the majority wrote, quoting the Supreme Court's plurality opinion in Elrod v. Burns in 1976).

continued in Executive Order 202.79 is hereby modified to suspend authorization for indoor dining within New York City effective on Monday December 14, 2020.

**EMERGENCY DEFINED**

16.    The Governor's initial Executive Orders were premised on the perceived need to "flatten the curve" of COVID-19 related resultant deaths in order to avoid and prevent the overwhelming of the the State's hospitals and healthcare ICU centers, not to eradicate the virus in its entirety. Despite the fact that the mortality curve was flattened months ago, the Governor has nonetheless continued to enforce, and most recently extend, his draconian unconstitutional prohibitions in an unbalanced and highly targeted manner against the Plaintiffs and other similarly situated small businesses across New York City.

17.    Under federal law, the term "*emergency*" is defined in 42 U.S. Code § 5122 as "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States."

18.    Emergency was an accurate designation of the sudden health

catastrophe that we found ourselves facing in the spring of this year when the magnitude of the COVID-19 pandemic began to come into focus. At that time, so little was known about the transmission and specific severity of the virus, and there was no testing available.

19.     On March 2, 2020, the New York State Legislature rushed through a bill amending § 29 of the New York State Executive Law which increased Governor Cuomo's powers. This bill was hastily pushed through on the premise that it was a COVID-19 related "necessity," as dictated by the Governor. On information and belief, there was no formal debate, prior public notice, and no media coverage prior to the bill's passing.

20.     The passing and continued imposition of this bill, and all subsequent orders are in violation of the New York State and United States Constitutions, because the bill exceeds the limits of government in a multiplicity of ways. Specifically, Articles 9 and 11 of the Constitution of the State of New York along with Article 1and the 14th Amendment of the United States Constitution.

21.     Moreover, the Executive Orders that have been issued subsequent to the passing of this bill are also in violation of the New York and United States Constitutions. The adverse ramifications of these orders have destroyed the State's economy, which in turn has decimated the financial well-being of

countless businesses and the scores of families whose livelihoods relied thereon.

22.     Precisely, more than 2,800 businesses in New York City have permanently closed since March 1 of this year according to data from Yelp, the business listing and review site; a higher number than in any other large American city. Roughly one-third of the city's 240,000 small businesses may never reopen, according to a report by the Partnership for New York City, a well-known and influential business group. So far, those businesses have shed at least 520,000 jobs; and counting.

23.     Nationwide, an estimated $25 billion in sales and more than 3 million jobs were lost in the industry in the first 22 days of March 2020. In New York, an estimated $1.9 billion in sales and more than 250,000 jobs were lost in the same period, operators reported a 58% decline in sales, 78% of operators laid off employees, and 48% of operators temporarily closed their restaurants.[5]

24.     New York City's restaurant industry had 23,650 establishments in 2019, provided 317,800 jobs, paid $10.7 billion in total wages citywide, and made nearly $27 billion in taxable sales. By August 2020, employment in the restaurant industry was still only 55% of its level in February 2020, before the

---

[5] "New York State Restaurant Association Releases Stats on Devastating Impact of Covid-19", Total Food Service, (March 30, 2020).

pandemic hit.[6]

25.     The true emergency, therefore, is the danger of the collapse of New York City's economy, and the greater deaths and suffering which result from the unintended consequences of closing indoor dining in New york City, which will undoubtedly come upon us quickly after the hospitality and small business sectors meet their demise this winter.

**FEDERAL RESPONSE TO COVID-19**
**PANDEMIC: JANUARY – MARCH 2020**

26.     To date, President Donald Trump has activated emergency powers under four separate statutes for the COVID-19 response. President Trump declared a public health emergency under the Public Health Service Act on January 31, 2020, issued two national emergency declarations under both the Stafford Act and the National Emergencies Act (NEA) on March 13, 2020, and invoked emergency powers via Executive Order under the Defense Production Act on March 18, 2020. On March 19, 2020, President Trump named the Federal Emergency Management Agency (FEMA) as the lead agency in the COVID-19 emergency response efforts, a designation previously held by the Department of Health and Human Services (HHS).

---

[6] "The Restaurant Industry in New York City, Tracking Recovery", Office of the New York State Comptroller, (September 2020).

27.     There are three sources of statutory authority for the federal government to issue an emergency declaration, each associated with varying procedures, resources, and funding. These include the Stafford Act, Public Health Service Act and National Emergencies Act. As of March 13, 2020, emergencies had been declared under all three acts. Additionally, the Defense Production Act affords the President broad powers to compel domestic industry production for the sake of national defense, including emergency activities under the Stafford Act.

28.     On March 13, 2020, the president declared an emergency for COVID-19 under Section 501(b) of the Stafford Act, pledging $50 billion in unspecified aid in the ongoing COVID-19 response efforts. Section 501(b) of the Stafford Act allows the federal government to declare an emergency without a governor's request and makes available only certain subsets of FEMA recovery funds. This generally enables FEMA to operate as a vehicle to deliver virus response funds to state and local governments.

29.     Declarations under the Stafford Act are typically associated with natural disasters, but they can also be used for health emergencies such as the COVID-19 outbreak. Stafford Act declarations can take several forms, each involving various procedures, types and amounts of assistance. These programs

are funded by the Disaster Relief Fund (DRF) which is currently funded at $42 billion. Emergency and catastrophic disaster declarations typically require a governor's request, based on well-documented and verified cost estimates via preliminary damage assessments. However, Section 501(b) of the Stafford Act allows the president to declare an emergency without a request from the governor of the affected state when the primary responsibility for the emergency rests with the federal government. Such an emergency declaration does not prevent the governor from subsequently requesting a major disaster declaration for other unmet needs caused by the event.

30. On March 13, 2020, the President also declared an emergency for COVID-19 under Section 201 and 301 of the National Emergencies Act. The National Emergencies Act (NEA) generally authorizes the president nearly unlimited discretion to declare a national emergency. These sections allow the Secretary of HHS to exercise the authority under section 1135 of the Social Security Act to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the pandemic. The Secretary of HHS must provide certification and advance written notice to the Congress. These waivers can loosen

restrictions on the use of telehealth and certain requirements for hospitals and healthcare providers to improve their response efforts.

31.     The NEA was enacted by Congress in 1976 to formalize presidential and congressional power — and related checks and balances — surrounding national states of emergency. However, this formalization does not include definitions for or requirements of the national emergency itself. The law does not itself provide authorities associated with a state of national emergency, though it does allow activation of powers provided the president in other statutes. A national emergency under NEA was also activated by President George W. Bush for the September 11th terrorist attacks in 2001.

**STATE OF NEW YORK'S RESPONSE**
**TO THE COVID-19 PANDEMIC**

32.     Based on speculative modeling on the influence and lethality of COVID-19, Governor Cuomo has issued executive orders that had all but shuttered civil society, placing the lives of 19.5 million people in constant turmoil as their livelihoods, homes, and sanity hinge on the Governor's monarchical next decision.

33.     On March 7, 2020, Governor Cuomo issued Executive Order 202, styled *Declaring a Disaster Emergency in the State of New York* ("Order 202").

Citing § 28 of Article 2-B of the New York Executive Law, C.F.R. 390.23(a)(1)(A), Section 112 of the New York State Finance Law, Article V, § 1 of the New York Constitution, as well as a host of additional state and federal statutes and rules, Governor Cuomo seized total and complete control over the operation of the state government independent of the legislature.

34.    The emergency measures that were haphazardly imposed to stave off spread of the disease in the spring, should have been replaced by traditional and well-established governmental safety mechanisms armed with existing and updated scientific and practical knowledge of the virus, and a desire to devise and implement long-term, sustainable measures that could lead to our collective thriving in this new reality. Instead, New York is suffering through the Governor's lasting bout with the intoxication of singular power.[7]

35.    The current Executive Orders target restaurant owners and businesses like the Plaintiffs and others similarly situated. These business owners, their employees and families will suffer the loss of revenue and the potential of losing businesses and jobs, and healthcare, simply because the Governor has decided that restaurants and bars in the Five Boroughs of New York City must

---

[7]   Notably, at the time of creation of our democracy, viral pandemics were widespread and deadly. Nevertheless, the founding fathers declined to incorporate a pandemic exception to our constitution. Clearly, this absence was well-thought and intended to have meaning. < www.mountvernon.com/pandemic > (accessed December 10, 2020).

completely shut down indoor dining (allowing only outdoor dining in the blistering cold winter season), while other businesses, particularly in Upstate New York, such as other bars, restaurants, hotels, other Hospitality Industry venues remain open and thriving.

36.    Manhattan —— home to the largest number of restaurants in the state — has a positivity rate of just 2.7%, which is less than half that of many counties throughout the state where indoor dining remains open. Albany remains at 7.2%, Westchester at 6.0% and Suffolk at 6.1%,. Restaurants in New York, as an industry, are only responsible for a minute 1.4% of virus cases as compared to 74% from indoor living room spread. Yet, only New York City's restaurants are being closed, even when hospitalization rates upstate are double the city's rate.[8]

37.    Accordingly, and as logic would have it, as indoor dining closes, private indoor gatherings increase, thereby increasing the infection, hospitalization and death rates due to COVID-19.

38.    These are the undisputable unintended consequences of a Governor who is surrounded by collective ignorance, the stubborn old guard, and those who are seeking to establish their rank in this surreal power-grab

---

[8]   "Urgent: Indoor Dining Shut in NYC on Monday", NYC Hospitality Alliance (December 3, 2020).

executed by the State government.

39.     Accordingly, we ask for indoor dining to resume in order to save lives — not to risk them.[9]

40.     We are entitled to federal enforcement of our constitutional democracy and we are entitled at a minimum to *life, liberty and the pursuit of happiness*.

41.     Without the support of empirical or data driven evidence, the Governor has unilaterally determined that any kind of indoor operation by restaurants and bars is part of the cause of the recent uptick in virus transmissions, while simultaneously permitting the often more crowded big businesses such as CVS, Target, Macys, Footlocker, Trader Joe's, and Whole Foods, that can literally be found next door. Or, permitting New Yorkers to get on crammed airplanes with 200 to 300 passengers sharing the same oxygen and capsule. There is no science or subsection of the New York or United States Constitutions that supports this dystopian edict.[10] Cuomo's decision to ban

---

[9] At a bare minimum, this court should issue an injunction authorizing indoor dining to remain for those spaces that institute best practices according to our now known and indisputable empirical medical data.

[10]   On Wednesday, December 8, 2020, Mayor Bill de Blasio declared that the "most identifiable piece of the puzzle" when it comes to the spread of COVID-19 has been travel, although bars and restaurants have also been sources for the virus escalating." But nothing has fostered the increase of COVID-19 cases more than private family gatherings, according to de Blasio. "The main driver appears to be family settings," de Blasio said. "Not so much being out in community settings. < www.nyeater.com/DiBlasio > (accessed December 10, 2020).

indoor dining only in New York City is based on his personal bias against the five (5) boroughs and nothing else.

42.     It is incumbent upon this Court to remind New York's Governor that the United States of America is a constitutional republic consisting of checks and balances, and is powered by the people and the people alone.   It is also incumbent upon this Court to remind New York's Governor that his authority to constrain freedom, liberty, and the free market is limited, not absolute. And it is incumbent upon this court to remind New York's Governor that those limits must always apply, under all circumstances, during times of war, peace, and pandemics:

> "No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such doctrine leads directly to anarchy or despotism." [11]

43.     Anarchy and despotism are our current state of affairs, and Plaintiffs are prepared to lead a healthy and robust resistance against our despotic State and city governments if this Court does not intervene in protection of our federal constitutional rights.[12]

---

[11]   Ex parte *Milligan*, 71 U.S. (4 Wall.) 120-122 (1866).

[12]   Legitimate questions have arised regarding the reasons for Cuomo's recent banning of the press at his administration's   briefings   <   www.newyorkpost.com/cuomo-shuns-press-citing-COVID-19   >   (accessed

44.     Plaintiffs, and others similarly situated, seek a judicial declaration that the executive orders, rules and enforcements issued by the Governor, that have and continue to destroy the financial viability and lives of the State's citizens — are unconstitutional under the Due Process Clause and other clauses of the United States Constitution, as well as under State law. Such a declaration, and a corresponding injunction, will result in more rational, pragmatic responses to the virus that will save lives, livelihoods, and preserve constitutional and democratic norms simultaneously.

45.     Plaintiffs, and all others similarly situated, bring this lawsuit to define the limits of a State's power. Whatever those limits are, no catastrophe or disaster can unlock absolute executive power and thereby cast our Constitution aside. The issues raised in this Verified Complaint are novel, and they will not be rendered moot if the Executive Order or any of the previous or future Orders are lifted before the Court issues judgement. The issues presented are capable of repetition and are of such importance that they cannot evade judicial review. The issues presented speak to the deepest core values of our constitutional republic and will set the tone for rebuffing government intrusion into the lives of private citizens for generations to come.

---

December 10, 2020).

46.    Governor Cuomo, in concert with the other named Defendants, continues to manage this crisis purely out of fear and pandemonic reactions. The "Emergency" should have been downgraded to "caution" with scientifically proven protocols mandated months ago. Our Government's goal should have been the sustainable reopening of the State's economy. However, the Governor continues to issue restrictive orders that are not based on science or geared toward safe, sustainable practices that would permit the State to operate. Unlike our collective position in the spring when the pandemic hit, we have an expanded knowledge base, a deeper medical and scientific understanding of the virus and the preventative measures that are available to prevent its spread.

47.    The Defendants continue to punish the citizens of the State of New York out of a combination of ignorance-based fear and power intoxication.

## JURISDICTION AND VENUE

48.    Jurisdiction is proper in this venue pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-2202.

49.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2) and (e)(1). Properties underlying the taxes that are central to this action are located in this District.

## CIVIL RIGHTS: 42 U.S.C. § 1983

50.    PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

51.    The CLASS asserts that DEFENDANTS have engaged in behavior that allows Civil Rights Title 42 U.S.C. § 1983 to be utilized as a vehicle to ensure enforcement of the provisions of the United States Constitution. Specifically, section 1983 provides an avenue in order to obtain redress for deprivations of a plaintiff's federally protected rights, committed by the named defendants acting under color of state law. See, e.g., *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002) (per curium).   *Sellman v. Baruch College of City Univ. of N.Y.*, 482 F. Supp. 475, 479 (S.D.N.Y. 1979) ("In order to state a cause of action under § 1983, the plaintiff must allege a deprivation perpetrated 'under color of state law.'").

52.    The Governor acted under the color of state law in issuing the Executive Orders, the enforcement of which subsequently violated and continues to violate the federally protected Constitutional rights of the Plaintiffs and others who are similarly situated. The right to assemble, the right to equal protections under the law, the right to due process of law are all Constitutionally protected rights that have been violated by the Governor while acting in his

official capacity. See *Doran v. N.Y. State Dept. of Health Office of the Medicaid Inspector Gen.*, 15-cv-7217 (PKC) (SN), at *21 (S.D.N.Y. Mar. 2, 2017) ("A state employee acting in his official capacity is acting 'under color of state law'"). *Landon v. County of Orange*, 08-CV-8048 (CS) (LMS), at *21 (S.D.N.Y. July 23, 2009) ("To state a claim for relief pursuant to Section 1983, Plaintiff must also allege that each of the Defendants was acting under color of state law in taking the complained — of actions. 'According to the Supreme Court, `a person acts under color of state law only when exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law'").

53.    Plaintiffs and others similarly situated have been deprived of inalienable rights that are protected by the United States Constitution. The Governor has not afforded a process of procedure by which parties who aggrieved by the enforcement of the Governor's Executive Orders can adjudicate their grievances or recover the losses that they have incurred as a result of the Orders. See *Petrella v. Siegel*, 843 F.2d 87, 89 (2d Cir. 1988) ("Regardless of possible state law remedies, interference with such a right without due process protections is a violation of the fourteenth amendment subject to redress under 42 U.S.C. § 1983").

## PARTIES

54.     Representative Plaintiff d/b/a SEAPORT HOUSE (HOPKINS HAWLEY LLC,a limited liability company and restaurant) is domiciled and operating in New York City, located at: 229 Front Street, New York, N.Y. 10038, at the historic South Street Seaport.

55.     Representative Plaintiff THE GREATER NEW YORK MERCHANTS ALLIANCE (hereinafter "NYMA") is a pending 501(c) non-profit entity which represents restaurant owners in the State of New York, domiciled and operating in New York, located at: 231 Front Street, New York, N.Y. 10038-0005.

56.     Representative Plaintiff COSTIN TARSOAGA is, and has engaged, in a lifetime of employment in the *front-of-the-house* (FOH). FOH is a term that hospitality industry insiders utilize to describe staff and employees that work in the *front-of-the-house* as opposed to the kitchen area, which is described as *back-of-the-house* (BOH). Mr. Tarsoaga has experienced a severe decline in his ability to perform 100% of his abilities in service of the public and has not been able to achieve similar, or substantially similar, business engagements in a growth oriented, meaningful, or similarly expansionary manner, as a proximate result of the oppressive executive orders. This is a direct result of the Governor's Executive Orders which infringe on Mr. Tarsoaga's ability to perform his art and

trade as he so wishes. Mr. Tarsoaga brings this action, by and through his attorneys, in order to relieve all other similarly situated persons in the Hospitality Industry from these oppressive measures, which have devastated said industry.

57.   SEAPORT HOUSE, NYMA, and COSTANTINE TARSOAGA, are collectively referred to as the "PLAINTIFFS" and/or the "REPRESENTATIVE PLAINTIFFS".

58.   Defendant ANDREW M. CUOMO (hereinafter "Cuomo" or "the Governor" or "State") is the current Governor of the State of New York and the individual who issued and signed the Order at issue in this case. The State Constitution requires that the Governor ensure that the laws of the state are "faithfully executed." Governor Cuomo's office for the transaction of business is located at the New York State Capitol Building, Albany, New York 12224.  He is sued in his official and individual capacities.

59.   The NEW YORK CITY SHERIFF'S OFFICE (hereinafter "NYCSO") consists of deputy sheriffs and civil investigators are New York State peace officers with authority to make warrantless arrests, issue summonses, carry and use a firearm, batons, pepper spray, handcuffs. Deputy sheriffs receive their peace officer status pursuant to the New York State Criminal Procedure Law (CPL) §2.10 subdivision 2, while criminal investigators receive their peace officer status from

CPL §2.10 subdivision 5. Deputy sheriffs are also civil enforcement officers with authority to enforce the New York State Civil Practice Law and Rules (CPLR) concerning civil procedure.[13] The NYCSO for the transaction of business is located at 66 John Street, 13th Floor, New York, New York, 10038.

60.     The NEW YORK CITY DEPARTMENT OF FINANCE (NYCDOF) has oversight and administrative capabilities which are exercised in control of the NYCSO. Specifically, the NYSDOF through the NYCSO administers New York City's unconstitutional enforcement of COVID-19 restrictions. The NYSDOF for the transaction of business is located at 66 John Street, Room 104, New York, N.Y., 10038.

61.     Defendant BILL De  BLASIO is the Mayor of New York City. As Mayor, De Blasio has final policymaking authority with respect to city policy generally, including with respect to the NYSDOF's oversight of the NYCSO. Bill Di Blasio for the transaction of business is located at Gracie Mansion, 88 East End Avenue New York, New York 10128. He is sued in his official and individual capacities.

---

[13]   **DEPARTMENT OF FINANCE: CHAPTER 58: NEW YORK CITY CHARTER § 1526 OFFICE OF CITY SHERIFF**: 1. There shall be within the department an office of the city sheriff which shall be subject to the supervision and control of the commissioner of finance. Notwithstanding any other provision of law, the commissioner of finance may exercise or assign within the department such management functions of the office of the sheriff, including but not limited to those functions related to the appointment and removal of deputy sheriffs and other personnel of such office pursuant to the civil service law, as he or she may deem appropriate to achieve effective and efficient functioning and management of such office. 2. Except as otherwise provided by law, the city sheriff shall exercise the functions, powers and duties formerly exercised by the sheriffs of the several counties. < https://nyccharter.readthedocs.io/c58/ >. (Accessed December 7, 2020).

62.     ANDREW CUOMO, the NEW YORK CITY DEPARTMENT OF FINANCE, THE NEW YORK CITY SHERIFF'S DEPARTMENT, and MAYOR De BLASIO are hereinafter referred to as the "DEFENDANTS."

## BACKGROUND

I.     **A BRIEF DESCRIPTION OF THE GOVERNOR'S DEFINED LEVELS OF RESTRICTIONS AND THEIR TRIGGERS**

63.     On December 23, 2020, the State of New York issued the "Cluster Action Initiative" which defines how the State will designate certain areas as "Clusters" based upon metrics such as positivity rates. Restrictions are defined in the initiative based upon the rolling 7-day average percentage of positivity rates in each area or cluster. The initiative will divide clusters and the areas around them into three categories with successively higher restrictions within each one: Red Zones, Orange Zones and Yellow Zones.

64.     On December 10, Governor Cuomo announced new metrics by which micro-cluster focus zones will be determined to help control COVID-19 spread and protect hospital capacity.

65.     A Red Zone will be implemented when a region, after the cancellation of elective procedures and a 50% increase in hospital capacity, is 21 days away from reaching 90% hospital capacity on the current 7-day growth

rate.

66.    A geographic area will be eligible to be designated as an Orange Zone if it has a 4% positivity rate (7-day average) over the last 10 days and it is in a region that has reached 85% hospital capacity. Alternatively, a geographic area may also become an Orange Zone if the State Department of Health determines the region's rate of hospital admissions is unacceptably high and a zone designation is appropriate to control the rate of growth.

67.    A geographic area will be eligible to enter a Yellow Zone if it has a 3% positivity rate (7-day average) over the past 10 days and is in the top 10% in the state for hospital admissions per capita over the past week and is experiencing week-over-week growth in daily admissions.

68.    Dining restrictions by cluster zone are defined in the initiative as:

    i.    Red Cluster Zone Dining Restrictions: Takeout or delivery only;

    ii.   Orange Cluster Zone Dining Restrictions: Outdoor dining, takeout, or delivery only, 4 person maximum per table, and bars and restaurants close at 10 pm for on premises consumption; and

    iii.  Yellow Cluster Zone Dining Restrictions: Indoor and outdoor dining permitted, 4 person maximum per table, and bars and restaurants close at 10 pm for on premises consumption.[14]

69.    The cluster restrictions are extremely prejudicial to Plaintiffs and

---

[14] "Cluster Action Initiative", New York State, New York Forward (December 23, 2020).

others similarly situated. There is, in essence, no middle or "Orange Cluster" available due to the indoor dining restriction and the freezing outdoor temperatures during the fall and winter months.

70.     Plaintiffs and those similarly situated are further prejudiced by the reality that New York City employs the most sensitive testing method available while other areas of the State and the State Department of Health employ a far less sensitive test which leads to fewer positive cases, fewer false positives, and ultimately lower positivity rates in those areas (*i.e.*, relaxed restrictions).

71.     The manner that the cluster zones are designed, favors certain cities and municipalities across the State while unjustly punishing those located in and around New York City.

## II.     DISTURBING STATISTICAL DISCREPANCIES.

72.     In June 2020, Governor Cuomo announced that 3% would be the State's official positivity rate benchmark or low water point for deciding the level of restrictions imposed in any given region of the State.[15] Below the 3% threshold, restrictions are lowered; above 3% restrictions are elevated. Nearly every aspect of the State's economy is balanced on the "percent positive" as this metric is

---

[15]  "The World Health Organization recommended in May that the percent positive remain below 5%." Centers for Disease Control, August 2020 Report on the Spread of Covid-19.

known in medical circles. The percent positive is "the percentage of all coronavirus tests performed that are actually positive, or: (positive tests / total tests) x 100%. The percent positive (sometimes called the "percent positive rate" or "positivity rate") helps public health officials answer questions such as: (i) what is the current level of SARS-CoV-2 (the virus that causes the disease known as COVID-19) transmission in the community, and (ii) is there enough testing for the amount of people who are getting infected?[16]"

73.    While the financial security of the entire body of the State's citizens is on hold based on this calculus, the Governor and Mayor De Blasio do not have a standardized or rational method of calculating the positivity rate.

74.    There are a variety of causes for the discrepancies that exist between the State and NYC's determination of the positivity rate on any given day. For instance, the State counts both antigen and *polymerase chain reaction* ("PCR") tests, which will produce a lower percentage of positive tests. New York City does not include antigen tests in its positivity count, opting to exclusively use PCR tests which are more sensitive and produce higher incidence of positive results. Antigen tests are known to miss positive tests in people carrying relatively insignificant amounts of the virus where many public health experts have stated

---

[16] "Covid-19 Testing: Understanding the Percent Positive", Johns Hopkins, Bloomberg School of Public Health (August 10, 2020).

that PCR tests are too sensitive.

75.     Another significant discrepancy in the calculation of the positivity rates between the State and New York City is that they each report new positive cases in a different manner which manipulates the underlying positivity rate. The State treats a new case as arising on the day the test results came in. New York City dates each new case to the day the sample was provided. So, if an infected person goes to a clinic to have his nose swabbed on Monday, that sample is often delivered to a laboratory where it is tested. If those results are reported to the health authorities on Wednesday, the State and city would record it differently. The State would include it with Wednesday's tally of new cases, while the city would add it to Monday's column. The 3 % threshold is based on a seven-day rolling average. The day that a new case is registered is of maximum importance in determining an accurate positivity rate.

76.     As recently as the last week of November, Governor Cuomo and Mayor De Blasio clashed over the actual positivity rate in New York City. The city said its seven-day average was 3.09%. Mr. Cuomo's office, however, put the city's rate at more than half a point lower, at 2.54%.

77.     One final yet glaring issue with the calculation and reporting of positivity rates is the way repeated positives are counted. If a person tests

negative repeatedly within a seven-day period, the city counts only a single test when calculating the positivity rate. But the State includes all negative tests from different days in its calculation. On the other hand, when someone tests positive repeatedly, the city includes each positive test when calculating the positivity rate. The State, however, only counts the first positive test and ignores subsequent results. That last variable — whether repeated positives are counted or not — has a significant effect on the positivity rate. Gareth Rhodes, a member of Mr. Cuomo's coronavirus task force, estimated that approximately 20% of positive PCR tests currently emerging from New York City were for someone who tested positive in the past.

78.     Plaintiffs and others who are similarly situated have their businesses and the lives of their employees and patrons teetering on the brink of certain disaster, based on governmental decisions that are haphazard and ill-informed at best. There is no science that supports the 3% benchmark. There is no logical rationale for the State to have one method of calculating and registering results and the City of New York a different method, while other cities in the State have even more variations.

79.     New York City restaurants languish under the Governor's Executive Order(s), while cities like Albany remain open for business. Not necessarily

because the positivity rate in Albany is lower, but because its positivity rate calculation is more liberally gathered and reported than that of New York City.

80.    The Governor's Executive Orders are not evenly enforced and Plaintiffs and others who are similarly situated are being deprived of their liberty and rights for reasons that are not justified given the facts underlying the decision-making processes.

III.    **ECONOMIC IMPACT OF PANDEMIC RESTRICTIONS ON RESTAURANTS, RESTAURANT WORKERS, AND STATE UNEMPLOYMENT.**

81.    The data indicates that 4 out of 5 restaurants, bars, and nightclubs in New York City (83%) could not pay their full rents in July, and more than a third (37%) were unable to pay anything, according to a new survey by the New York City Hospitality Alliance, a trade association for New York hospitality businesses.

82.    Manhattan is home to the largest number of restaurants in the State, yet it has a positivity rate of just 2.7%, which is less than half that of many counties throughout the State where indoor dining remains open. Albany is currently at (7.2%), Westchester (6.0%), and Suffolk (6.1%). According to Governor Cuomo himself, restaurants, as an industry, are only responsible for 1.4% of virus cases, as compared to 74% from indoor gathering (*e.g.*, living room spread). Yet, only New York City's restaurants are being closed even when

hospitalization rates in Upstate New York are double the city's rate, and the positivity rates in upstate New York are nearly quadruple. This is hypocrisy at its finest.

83.   Recent studies indicate that nearly 3 out of 4 landlords (71%) refused to waive any of the due rent, 3 out of 5 (61%) would not defer the payments, and 9 of 10 (90%) declined to formally renegotiate leases.[17]

84.   Food and drinking establishments shed at least 234,000 jobs during the shutdown in the five boroughs, or nearly half a million jobs throughout the State, according to data released by the U.S. Bureau of Labor Statistics on June 19th. 105,000 city hospitality staffers were still working in May, when the metropolitan area had not yet reached the first phase of reopening — up from 91,000 in April. That is just a third of the jobs that were available in February. It is also the lowest level of hospitality industry employment since before December of 1992, constituting a temporary erasure of nearly 30 years' worth of jobs growth.[18]

85.   These grim statistics coincide with the larger jobless picture in New York City, and the State of New York, where overall unemployment increased to

---

[17]   "83% of N.Y.C Restaurants and Bars Can't Pay Their Rents," Restaurant Business, August 4, 2020.

[18]   "New Unemployment Numbers Show N.Y.C Has Lost Two-Thirds of Its Food Jobs", N.Y.C. Restaurant News, June 23, 2020.

18.3% in May — well above the already high federal rate of 13.3%. Foreign-born and BLPOC workers saw even higher jobless rates, approaching Great Depression levels. Asian unemployment in New York, as has been previously reported, rose the highest, jumping from 3.4% in February to 25.6% in May, according to members of the state COVID-19 Task Force, who cited Current Population Survey data. Unemployment was almost equally stratospheric for Hispanics, at 25.1%, and for Black people, at 23.5%.

86.    Not all businesses are affected proportionally. Profits soared by an average of 39% in the first half of the year at supermarket chains and other food retailers, thanks to the pandemic, although front-line workers reaped little or no benefit, a new report shows.  At Cincinnati-based Kroger Company, profits for the first two quarters were up a staggering 90%, according to the report from the Brookings Institution, a Washington, D.C.-based think tank.[19]

87.    Kroger saw its net earnings for the first two quarters jump to more than $2.031 billion compared with $1.069 billion in the same period of 2019. Third-quarter profits, which were reported in early December, were not included in the Brooking Institute report. When those are included, the company's net earnings of $2.662 billion are up just short of 100% for the first three quarters

---

[19]   "Windfall Profits and Deadly Risks: How the Biggest Retail Companies are Compensating Essential Workers During the Covid-19 Pandemic", Brookings Institution (November 2020).

compared with 2019. Walmart profit was $15.6 billion for the first three quarters compared with $10.7 billion for the same period for 2019, a 45% increase. Amazon, which owns Whole Foods, saw a $17.4 billion profit for the first three quarters, up $6 billion from the same period last year. That amounted to a 53% increase. Costco's profit was $2.2 billion for the first two quarters of 2020, an increase of $244 million from 2019 or 11%.

88.     While Plaintiffs and others who are similarly situated hang on for the lives of their businesses, and others have already shuttered, the largest, wealthiest retail stores are recording record profits. Large retailers have been largely absent from the restrictive orders issued by Governor Cuomo and other officials across the country. Plaintiffs and others who are similarly situated have endured the brunt of the negative impact of Governor Cuomo's Orders.[20] (See *Mullarkey v. Borglum*, 323 F. Supp. 1218, 1224 (S.D.N.Y. 1970): "First Amendment rights are secured to plaintiffs by the due process clause of the Fourteenth Amendment to the Federal Constitution against infringement by the state. Equal protection of the laws of a state are also secured against state infringement by the equal protection clause of that Amendment."

## V.     CLASS ACTION ALLEGATIONS

---

[20] *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 558 (S.D.N.Y. 2013) ("The Equal Protection Clause of the Fourteenth Amendment guarantees to every person the equal protection of the laws.").

89.     PLAINTIFFS seek Class Action Certification pursuant to Fed. R. Civ. P. 23.

90.     PLAINTIFFS bring this action individually and on behalf of those similarly situated *i.e.,* bar and restaurant owners throughout the State who have been economically impacted by the various ongoing Orders whose curfews and other restrictions have caused irreparable economic harm and a bevy of Constitutional and other deprivations of liberties and rights.

### *Numerosity:*

91.     Members of the Plaintiff class are so numerous that joining all members is impracticable.

92.     The exact number of class members is unknown to the Representative Plaintiffs currently. There are thousands of bar and restaurant owners who are similarly situated to the Representative Plaintiffs.

93.     It would be impractical to join the Plaintiff Class members individually and there is no need for this Court to do so to grant the relief sought in this action.

### *Common Questions of Law:*

94.     Common questions of law and fact exist as to all members of the

Plaintiff Class and prevail over any questions solely affecting individual members of the Plaintiff Class.

95.    Such common questions of law are the constitutionality of the Orders, the need for judicial clarification of the Governor's executive powers, and the need for financial and procedural relief from the economic impact(s) of the Orders issued and imposed by the Governor and the State, whether the Plaintiff Class is entitled to declaratory and/or injunctive relief, compensatory, general, and/or punitive damages.

### *Typicality:*

96.    The Causes of Action, facts, and claims being brought by the Representative PLAINTIFFS are typical and common to the claims of all members of the Plaintiff Class.

### *Adequacy:*

97.    Plaintiffs' Class will be fairly and adequately represented by Representative PLAINTIFFS.

98.    Representative PLAINTIFFS are interested in pursuing this matter to completion with the intent on a proper and fair outcome for all others similarly situated.

99.    Representative PLAINTIFFS have retained competent and

experienced attorneys to represent the interests of the Plaintiff Class.

100.    Representative PLAINTIFFS hold no adverse interest or conflict with any member of the Plaintiff Class entitled to relief sought herein.

101.    Counsel who has been selected by the Representative PLAINTIFFS has no interest to or in conflict with that of any individual who might be entitled to the relief sought herein.[21]

**_Superiority_:**

102.    A class action is superior to all other available methods as it will ensure fair and efficient adjudication of this matter.

103.    Counsel and Representative PLAINTIFFS are not aware of any difficulty that would prevent proper management of this action or maintenance of a Class Action.

**ALTERNATE CLASS CERTIFICATION
PURSUANT TO F.R. CIV. P. 23(B) AND/OR 23(C)**

104.    Prosecution of similar actions separate from this matter, by individual members of the Plaintiff Class create a risk of inconsistent or varying adjudication with respect to individual Class members and may create incompatible guidelines and law for DEFENDANTS.

---

[21]    Representative Plaintiff COSTIN TARSOAGA maintains a consulting agreement with d/b/a SEAPORT HOUSE which is wholly-owned by attorney Kian. D. Khatibi, signatory herein, Representative Plaintiff, and President of The Greater New York Merchants' Alliance.

105.    The prosecution of separate actions by individual Class members would create a risk of decisions that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

106.    DEFENDANTS acted on grounds generally applicable to the Plaintiff Class, thereby making appropriate final declaratory and injunctive relief with respect to the members of the Plaintiff Class as a whole.

107.    All the Plaintiff Class have claims and issues of commonality that should result in certification pursuant to Rule 23(c)(4).

## FIRST CAUSE OF ACTION

**DEPRIVATION OF FUNDAMENTAL LIBERTY INTERESTS INCLUDING THE RIGHT TO PUBLICLY ASSEMBLE AND PROTEST OUR GOVERNMENT. THE STATE MUST UTILIZE THE LEAST RESTRICTIVE MEANS IN ORDER TO ACHIEVE THE STATE'S ALLEGED LEGITIMATE INTERESTS.**

108.    PLAINTIFFS repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

109.    The CLASS asserts that DEFENDANTS have deprived Plaintiffs and others similarly situated of core rights and fundamental liberties including the right to publicly assemble and protest our government. Defendants have also failed to utilize the least restrictive means of achieving the State's allegedly

legitimate interests.

110.   There are several scientifically supported, less restrictive alternatives that the Governor could implement, that would serve to protect the population from the onslaught of the virus while ensuring that the unquestionable rights of citizens like the Plaintiffs and those similarly situated are not unconstitutionally violated.[22]

111.   Some of the scientifically supported measures include:

    i.   Isolating and subsidizing elderly and immunocompromised citizens while avoiding isolating those demographics that have shown to be least likely to be hospitalized upon infection of the virus;

    ii.  Allowing spaces that are properly ventilated to operate;

    iii.  Employing the ventilation methods employed by the airlines;[23]

---

[22]   Andrew Rigie, executive director of the NYC Hospitality Alliance, pointed out that not only does Manhattan have the highest concentration of restaurants in the state, it also has a lower infection rate compared to other counties at 2.5% which is also the seven-day rolling average. The alliance has previously reported survey results which found that most restaurants in New York City were barely able to make the rent even after outdoor dining was made available in the summer. "New York City's highly regulated, reduced occupancy, well-ventilated and COVID-19 compliant restaurants have gone above and beyond to protect the health and safety of their customers and employees. Indeed, Governor Cuomo said that 70% of recent cases come from "living room" spread, not restaurants, and the NYC Department of Health has zero data demonstrating that increased infection rates are a result of our highly restricted restaurants," Rigie said. "Another forced government closure of New York City restaurants will cause an irreversible harm on even countless more small businesses and the hundreds of thousands of workers they employ, especially if it is not coupled with financial relief." < www.nbc4news.com > (accessed December 8, 2020).

[23]   Airlines have been permitted to reopen and operate as a result of their ventilation systems although these are confined spaces where travelers sit for hours at a time breathing recycled air.

iv. Subsidization the mandatory implementation of large floor mounted barrel fans, floor mounted UV-C light and commercial air purifiers, hands free electronic faucets and toilets, and other continuous air and surface cleaning technologies.[24]

112. Existing theoretical models of airborne disease transmission in closed, well-mixed spaces are based on the seminal work of *Wells*[25] *and Riley et al.*,[26] and have been applied to describe the spread of airborne pathogens including tuberculosis, measles, influenza, H1N1, coronavirus (SARS-CoV)[27] and most recently, the novel coronavirus (SARS-CoV-2).[28] These models are all based on the premise that the space of interest is well mixed; thus, the pathogen is distributed uniformly throughout. In such well-mixed spaces, one is no safer from airborne pathogens at 60 feet than 6 feet. The *Wells-Riley Model*[29] highlights the role of the room's ventilation outflow rate Q on the rate of infection, showing

---

[24] "Focus on Fluids: Effects of ventilation on the indoor spread of COVID-19", Journal of Fluid Mechanics, September 2020.

[25] Wells, W.F. et al, "Airborne contagion and air hygiene, an ecological study of droplet infections. (1955).

[26] Riley, E.C., Murphy, G & Riley, R. L., "Airborne spread of measles in a suburban elementary school", American Journal of Epidemiology pg. 107, 421-432 (1978).

[27] Rudnick, S & Milton, D. "Risk of indoor airborne infection transmission estimated from carbon dioxide concentration. Indoor Air 13, 237-245, (2003).

[28] Buonanno, G., Stabile, L. & Morawska, L. "Estimation of airborne viral emission.... Environment International 141, 105794 (2020).

[29] Noakes, C., Beggs, C., Sleigh, P. & Kerr, K. "Modelling the transmission of airborne infections in enclosed spaces", Epidemiology & Infection 134, 1082-1091 (2006).

that the transmission rate is inversely proportional to Q, a trend supported by data on the spreading of airborne respiratory diseases on college campuses. The additional effects of viral deactivation, sedimentation dynamics and the polydispersity of the suspended droplets were introduced by *Stilianakis & Drossinos*[30] and recently applied to COVID-19.

113.   Governor Cuomo has not meaningfully consulted with the scientific community and has missed the opportunity to leverage decades of research and empirical data on the subject. This missed opportunity resulted in our inability to devise methods of operation that would be safe, effective, and productive.

114.   In the absence of any attempt to identify, investigate, and implement long-term, scientifically supported, sustainable and measurable guidelines, Plaintiffs, and others similarly situated, are left in an unconstitutional and unpragmatic quagmire. Governor Cuomo has ceded control of the State's legislative framework and singularly controls the financial fate and the for granted freedoms of the Plaintiffs and those similarly situated.

115.   Until there is a proven vaccine that is widely adopted by the citizens, the virus will surge and retreat. The citizens of New York should not be

---

[30]   Stilankis, N. I. & Drossinos, Y., "Dynamics of infectious disease transmission by inhalable respiratory droplets", Journal of the Royal Society Interface 7, 1355-1366 (2010).

held captive to its whims indefinitely when there are less restrictive, productive means available to quell the spread until a vaccine is available and prevent future outbreaks from ever reaching this critical level.

116.   In the absence of a sustainable, less restrictive plan of action, Plaintiffs and those similarly situated have had their rights violated without any *pre-* or *post-*processes of law to address the deprivations.

117.   Moreover, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in `life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon*, 494 U.S. at 126 (citing *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)); see also *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."). As the Court stated in Zinermon, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." 494 U.S. at 126. *Best v. St. Vincents Hospital*, 03 Cv. 0365 (RMB) (JCF), at *1 (S.D.N.Y. July 2, 2003).

118.   This Court has long held that "when First Amendment rights are implicated, the government must adopt the least restrictive means available

that will allow it to pursue a legitimate state interest to satisfy this "carefully tailored requirement." See *Andrews v. Education Ass'n of Cheshire*, 829 F.2d 335, 339 (2d Cir. 1987).

<u>**SECOND CAUSE OF ACTION**</u>

**THE STATE'S EXECUTIVE ORDERS ARE AN UNCONSTITUTIONAL INFRINGEMENT ON THE POWERS OF THE FEDERAL GOVERNMENT AS REGULATED BY THE *DORMANT COMMERCE CLAUSE.***

119.   PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.   The CLASS asserts that the Governor's Executive Orders are an unconstitutional infringement upon the powers of the federal government as regulated by the *Dormant Commerce Clause*.

121.   The *"Dormant"* Commerce Clause ultimately means that because Congress has been given power over interstate commerce, states cannot discriminate against interstate commerce nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity. See *Grand River Enterprises Six Nations v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005) ("While the Commerce Clause is more frequently invoked as authority for federal legislation, the so-called *Dormant Commerce Clause* limits state legislation that adversely affects interstate commerce."). *Automobile Club of New York, Inc. v.*

*Dykstra*, 423 F. Supp. 2d 279, 282 (S.D.N.Y. 2006) ("The 'dormant' Commerce Clause as the law terms it is the 'other-side-of-the-coin' limitation on the power of the states to enact laws imposing substantial burdens on interstate commerce").

122.    The State has clearly violated and supplanted the spirit and purpose of the *Dormant Commerce Clause* of the United States Constitution. See *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 177 (S.D.N.Y. 1997) ("This encroachment upon the authority which the Constitution specifically confers upon the federal government and upon the sovereignty of New York's sister states is *per se* violative of the Commerce Clause").  *Dougall v. Sugarman*, 339 F. Supp. 906, 910 (S.D.N.Y. 1971) ("Since such laws encroach upon exclusive federal power, they are constitutionally impermissible").

123. Actions taken by the State must not discriminate against *out-of-state* actors or *out-of-state* competition or have the effect of favoring *in-state* economic actors. See *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 560 (S.D.N.Y. 2014) ("'The negative or dormant implication of the *Commerce Clause* prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace. 'Gen.'").

124.    If the law is discriminatory, then the state must show it has no other

(reasonable) means of advancing a legitimate local (important, non-economic state interest, such as health or safety) purpose. See *SANTA FE NATURAL TOBACCO CO., INC. v. SPITZER*, 00 Civ. 7274 (LAP), 00 Civ. 7750 (LAP), at *0 (S.D.N.Y. June 8, 2001): "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state economic interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." See also *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 763 (1995): "The Court will consider the statute invalid without further inquiry when it 'directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests,' *id.*, at 579; and it will balance the State's interest against the burden on interstate commerce when the statute 'has only indirect effects on interstate commerce and regulates evenhandedly,' *ibid*. (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970))."

125.  Half of all New York restaurant income is driven by tourists and <u>interstate travel</u>. Only the federal government can implement a rule that would

have such a limiting effect on interstate travel & commerce. The Orders violate the *Dormant Commerce Clause* in that they disproportionately burden interstate commerce as it requires out-of-state commerce to be conducted at the direction of Governor Cuomo's Orders. See *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001): "A regulation may disproportionately burden interstate commerce if it has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction." See also *Thomas More Law Center v. Obama*, No. 11-117, at *11 (July 26, 2011): "The Court in those cases made clear that a purely local activity that substantially affects interstate commerce, such as providing lodging accommodations or food to customers traveling interstate and dealing in and consuming-goods that were very much a part of interstate commerce, is properly within the reach of the Commerce Clause because the local activity substantially and directly affects interstate commerce". Also see *South Dakota v. Wayfair, Inc.*, No. 17-494, at *4 (June 21, 2018): "Finally, other aspects of the Court's Commerce Clause doctrine can protect against any undue burden on interstate commerce, taking into consideration the small businesses, startups, or others who engage in commerce across state lines."

126.   **The** State's actions must not be unduly burdensome *in both equity*

*and law*. If the law only incidentally burdens interstate commerce, or if the law is nondiscriminatory, the court will balance whether the benefits of the state's interest are outweighed by the burden on state commerce, by looking to the following:

**a. Are there less restrictive alternatives?**

127.   The Governor's Orders discriminate against interstate commerce while there are other means available for the State to accomplish its goals. See *Tennessee Wine and Spirits Retailers Assn. v. Thomas*, 139 S. Ct. 2449, 2459 (2019) ("Applying standard dormant Commerce Clause scrutiny, the majority struck down the challenged restrictions, reasoning that they facially discriminate against interstate commerce and that the interests they are claimed to further can be adequately served through reasonable, nondiscriminatory alternatives"). *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 605 (1997) ("These are non-regulatory alternatives — immune from negative Commerce Clause attack — but they are not nondiscriminatory alternatives, which is what the exception to the 'virtually *per se* rule of invalidity' requires").

**b. Are there any conflicts with other states' regulations?**

128.   The Governor's Orders are prejudicial towards favors in state economic interests without regards for out of state economic interests. See

*Santa Fe Natural Tobacco Co., Inc. V. Spitzer*, 00 Civ. 7274 (LAP), 00 Civ. 7750 (LAP), at *0 (S.D.N.Y. June 8, 2001) ("When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state economic interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits").

### THIRD CAUSE OF ACTION

**VIOLATION OF THE FOURTEENTH AMENDMENT: DUE PROCESS.**

129.   PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.   The CLASS asserts that DEFENDANTS have engaged in behavior that violated the right to Procedural Due Process.

131.   DEFENDANTS' actions have deprived the CLASS of its right property rights, specifically their right to compensation.

132.   No State hearing of any sort is available for the CLASS to address the loss of compensation. No end of the losses is in sight.

133.   Under the Due Process Clauses of the Fifth and Fourteenth

Amendments, " no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard." *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007).

134.   The Courts have held that to make a claim for a violation of procedural due process, a plaintiff must allege and prove that available process was inadequate. Where a defendant's actions were random and unauthorized, post-deprivation remedies can constitute due process. See *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir.1996). The adequacy of post-deprivation remedies is a question of law. See *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir.1998). See also, *Ferran v. Town of Poestenkill*, 234 F.3d 1261 (2d Cir. 2000).

135.   The Governor's issuance of the Order(s) and the loss of revenue, income, and jobs when there are less restrictive alternatives available, have created an irreparable economic loss that continues.

136.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amdn. XIV, § 1, cl. 3. The procedural component of the Due Process Clause prohibits government from depriving Plaintiffs and members of the putative Class of liberty and property

interests without providing any process before or after the deprivations occurred.

137.    There are no post-deprivation remedies available to the Plaintiffs that will adequately remedy the ongoing loss of compensation resulting from the Orders. To establish a procedural due process, claim pursuant to 42 U.S.C. § 1983, Plaintiffs and Class members must show that (1) they had a life, liberty, or property interest protected by the Due Process Clause; (2) they were deprived of this protected interest; and (3) the state did not afford them adequate procedural rights. See *Daily Servs,. LLC v. Valentino,* 756 F.3d 893, 904 (6th Circ. 2014).

138.    Plaintiffs and the putative Class members have a protected liberty interest in the right to live without arbitrary governmental interference with their liberty and property interests. *See County of Sacramento v. Lewis,* 523 U.S. 833, 845 (1988).

139.    Liberty "denoted not merely freedom from bodily restraint but also the right of the individual to contract, engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home, raise children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ***as essential to the

orderly pursuit of happiness by free men." *Board of Regents of State Colleges v. Roth,* 408 U.S. 572 (1972) (emphasis added).

140.   Plaintiff and members of the putative Class have protected liberty and property which Defendants interests, infringed through the Executive shutdown Orders: Members have been, and are being, denied the right to engage in commerce, to-wit: operating indoor dining in their restaurants and bars.

141.   Governor Cuomo did not provide any procedural due process before issuing the Executive Orders. Nor do the Orders provide any *post*-deprivation review.

142.   Governor Cuomo acted under color of State law in an official capacity and within the scope of his official duties when issuing the executive Orders.

143.   As a direct and proximate cause of the failure to provide any pre- or post-deprivation process, Plaintiff and members of the putative Class suffered and continue to suffer prejudice under threat of criminal and civil sanctions.

144.   These orders and rules acknowledge that other businesses can operate where patrons are inside by adhering to "social distancing" rules.

145.   By failing to provide any *pre*- or *post*-deprivation review of the

orders and rules that cause businesses to close early and restrict their financial ability to recover from previous restrictions, Plaintiffs and members of the putative Class are suffering substantial losses of liberty and property including the loss of substantial revenue and income that impacts countless families across the State.

## FOURTH CAUSE OF ACTION

### LEGISLATURE CANNOT DELEGATE CORE DECISION MAKING AUTHORITY TO THE EXECUTIVE BRANCH.

146.   PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

147.   The CLASS asserts that application of two distinct constitutional principles contributed to the development of the nondelegation doctrine: *Separation of Powers* and *Due Process*. See *Arizona v. California*, 373 U.S. 546, 626 (1963) ("The principle that authority granted by the legislature must be limited by adequate standards serves two primary functions vital to preserving the separation of powers required by the Constitution").

148.   This rigid application of separation of powers prevents the lawmaking branch from divesting itself of any of its power and conferring it on one of the other branches. The doctrine is not rigidly applied in a manner such

as to prevent conferral of such significant authority directly to the executive branch. In re: *J.W. Hampton, Jr. &Co. v. United States,* Chief Justice Taft explained the doctrine's import in the delegation context. "The Federal Constitution...divide(s) the governmental power into three branches....in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with wither power or judicial power.

149.    In the current case the State and city governments have delegated virtually all the Legislative Powers to the Executive Branch which has resulted in a loss of democratic representation and annihilation of the Balance of Powers. These actions cast aside the Constitution without regard. See *Mistretta v. United States*, 488 U.S. 361, 415 (1989) ("It is difficult to imagine a principle more essential to democratic government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature").

150.    The Underlying structure of our representative system of government consists of three branches in which all governmental power is distributed – the

executive, legislative and judicial (N.Y. Const. art III, § 1, art. IV; see also N.Y. City Charter, Ch. 1, § 3, Ch., 2 § 21). Respect for this structure and the system of checks and balances inherent therein requires that none of these branches be allowed to usurp powers residing entirely in another branch. See *Youngstown Co. v. Sawyer*, 343 U.S. 579; *Matter of Nicholas v. Kahn*, 47 N.Y. 2d 24, 20-31).

## FIFTH CAUSE OF ACTION

### THE ORDER IS UNCONSTITUTIONAL *AS APPLIED* TO A PROPERLY FILTERED AND COMPLIANT SPACE. [31]

151.   PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.   The CLASS asserts that DEFENDANTS have unilaterally applied the Order and its prohibitions to Plaintiffs and others similarly situated without regard for the level of risk posed by these facilities on a case-by-case basis.

153.   While a law may be constitutional on its FACE, it may not be as APPLIED. Facial and as applied challenges differ in the type of relief sought. The Supreme Court has stated on multiple occasions that it favors as applied challenges over facial challenges. The High Court has expressed a preference

---

[31]   The First Amendment to the United States Constitution states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances" The right of a citizen to peacefully 1) parade and gather or 2) demonstrate support or opposition of public policy or 3) express one's views, is guaranteed by the freedom of speech and the right to peaceably assemble.

for "a narrower remedy" that could "fully protect the litigants," rather than a much broader facial challenge that would provide relief to nonparties" by invalidating an entire statute. *United States v. Treasury Employees,* 513 U.S. 454, 477-478 (1995).

154.   In the current case, Plaintiff Hopkins and Hawley d/b/a SEAPORT HOUSE has purchased and installed a variety of *clean-air* and ventilation systems that essentially allows for a significant portion of airflow and air distribution to flow directly out the front and back of the establishment, and the remaining air to be cleaned inside thru floor mounted HVAC and UV-C light and filters, that work alongside high air-dispersion barrel fans — that push air to the outside which mimics, if not exceeds an outdoor ecosystem.

155.   The setup implemented by Plaintiff Hopkins Hawley follows the research and guidance that is supported by scientific evidence that it protects its workers and consumers. *See* Exhibit C.[32]

156.   "[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply `posit the existence of the disease sought to be cured' [i]t must demonstrate that the recited harms are real, not merely conjectural, and that

---

[32]   Exhibit C – Hopkins and Hawley Floor Plan.

the regulation will in fact alleviate these harms in a direct and material way." See *Turner Broadcasting System*, 512 U.S., at 664, see also *United States v. Treasury Employees*, 513 U.S. 454, 475 (1995).

157.   When a court is required to determine the validity of a restraint or prohibition such as those imposed by the Defendant's Order(s), it must "arrive at a balance between the interests of the ***citizen, in commenting upon matters of public concern and the interest of the State, in promoting the efficiency of the public services it performs ***" *Pickering*, 391 U.S., at 568.

158.   In the instant matter, the members, constituents of SEAPORT HOUSE, and the greater *New York City Community* desire to assemble and protest their government's tyrannical implementation of restrictions on fundamental liberty interests — and during inclement weather, we choose to do so at traditional Public Houses, a/k/a "pubs" and other like event spaces. This desire of the people to gather indoors in more safe spaces is exceedingly legitimate by any standard and unduly transcends all other edicts.

159.   The Governor's Orders have critically wounded the financial health of the Plaintiffs and those who are similarly situated, regardless of the realities of the individual establishments who bear the financial brunt of the prohibitions.

160.   The issuance of the Order and each subsequent extension thereof

constitutes a regulatory taking.

## SIXTH CAUSE OF ACTION

## SUPPLEMENTAL JURISDICTION
## OVER NEW YORK STATE CLAIMS [33]

161.    Under Title 28, Part IV, Chapter 85, Section 1367, of the United States Code, this federal district court is authorized to review and opine on state law based claims and execution of state laws, under its *Supplemental Jurisdiction* mandate.

162.    Moreover, the statue instructs that:

(a)    Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in <u>any civil action of which the district courts have original jurisdiction</u>, the district courts shall have supplemental jurisdiction over all other claims that are <u>so related to claims in the action within such original jurisdiction that they form part of the same case or controversy</u> under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties;

(b)    In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules

---

[33] U.S. Code Title 28. JUDICIARY AND JUDICIAL PROCEDURE Part IV. JURISDICTION AND VENUE Chapter 85. DISTRICT COURTS; JURISDICTION Section 1367. Supplemental jurisdiction.

of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332;

(c)    The    district    courts    <u>may</u>    decline    to    exercise supplemental jurisdiction over a claim under subsection (a) if:

> (1)    the claim raises a novel or complex issue of State law;

> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

> (3)    the district court has dismissed all claims over which it has original jurisdiction; or

> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d)    The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e)    As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

163.    Accordingly, this court has authority to effectuate judgment over

New York State law claims under Title 28, Part IV, Chapter 85, Section 1367, of the

United States Code.

164.   In the instant matter, we have a declared State of Emergency coupled with unprecedented, overreaching, and oppressive Executive Order issued by the State of New York.

165.   However, under *The Laws Of New York: Consolidated Laws Executive: Article 2-B: State And Local Natural And Man-Made Disaster Preparedness* the actions of the Governor are both illegal under the statutes and the Constitution of the United States of American and the Constitution of the State of New York.

166.   Moreover, Section 28 of the forgoing Article, mandates only that:

1.   Whenever the governor, on his own initiative or pursuant to a request from one or more chief executives, finds that a disaster has occurred or may be imminent for **which local governments are unable to respond adequately**, he shall declare a disaster emergency by executive order.

2.   Upon declaration of a disaster arising from a radiological accident, the governor or his designee, shall direct one or more chief executives and emergency services organizations to:

(a)   notify the public that an emergency exists; and

(b)   take appropriate protective actions pursuant to the radiological emergency preparedness plan approved pursuant to sections twenty-two and twenty-three of this article. The governor, or his designee, shall also have authority to direct that other actions be taken by such chief executives pursuant to

their authority under section twenty-four of this article.

3.     The executive order shall include a description of the disaster, and the affected area. **Such order or orders shall remain in effect for a period not to exceed six months or until rescinded by the governor, whichever occurs first**. The governor may issue additional orders to extend the state disaster emergency for additional periods not to exceed six months.

4.     Whenever the governor shall find that a disaster is of such severity and magnitude that effective response is beyond the capabilities of the state and the affected jurisdictions, he shall make an appropriate request for federal assistance available under federal law, and may make available out of any funds provided under the governmental emergency fund or such other funds as may be available, sufficient funds to provide the required state share of grants made under any federal program for meeting disaster related expenses including those available to individuals and families.

167.   Accordingly, as a matter of *first-course* and prior to requesting and accepting the total delegation of our legislative representatives, it must be **OBJECTIVELY** determined under New York State law that **local governments are unable to respond adequately**. *The Laws Of New York: Consolidated Laws Executive: Article 2-B: State And Local Natural And Man-Made Disaster Preparedness, Section 28, subsection 1.*

168.   As this was not the case, it must first be determined by the federal court if local New York State governments can respond adequately to the pandemic without the oversight of the Executive Orders.

169.   As well, the only logical implication to this clause requires that such inability of local governments to respond, to be assessed on a rolling and continuous basis.

170.   It is certain, at this time, that local governments can require through the local municipal codes for restaurants and other Hospitality Industry facilities utilize best-practices, including but not limited to, installation of HEPA or other sophisticated ventilation systems, require the same to open all windows and doors even in inclement weather, and other measures.

171.   Accordingly, we respectfully ask this court to declare the Executive Orders relating to the pandemic as illegal under New York State law and the New York State Constitution and issue an injunction to their enforcement.

**SEVENTH CAUSE OF ACTION**

**INJUNCTIVE RELIEF AND JUDICIAL REVIEW.**

172.   PLAINTIFFS repeat and reallege by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

173.   A preliminary injunction is required to pause the State of New York from the current enforcement of the Order, from the issuance of further Executive orders without a determination from the Court as to the Constitutionality of the Governor's orders. Plaintiff's requested preliminary

injunction merely seeks to preserve the parties' status quo. This is a proper purpose of preliminary injunctive relief and is necessary to protect against irreparable harm until the court can render a meaningful final judgment on the merits. The purpose of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit to preserve the court's ability to render a meaningful judgment on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Guinness Sons v. Sterling Pub. Co.*, 732 F.2d 1095, 1099 (2d Cir. 1984); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963); In re *Microsoft Corporation Antitrust Litig*, 333 F.3d 517, 525 (4th Cir. 2003).

174.   A party seeking a permanent injunction must demonstrate:

   i.   That it has suffered an irreparable injury;

   ii.   That remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

   iii.   That, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and,

   iv.   That the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L.Ed.2d 641 (2006); see also *EMA Financial LLC v. Aim Exploration, Inc.*, No. 18 Civ. 145, 2019 WL 689237, at *12 (S.D.N.Y.

Feb. 19, 2019) (quoting and applying eBay).

175.   In the case at bar, the Plaintiffs and those similarly situated have been and continue to suffer irreparable injury that monetary damages would be inadequate and a remedy in equity is warranted. Plaintiffs and those similarly situated have lost untold amounts of revenue, incurred expenses adding and updating ventilation systems and other preventative measures that have not prevented the Governor from imposing further restrictions. Further, restricting the operating times of Plaintiff's businesses, during these down economic times is paramount to a slow but certain death of the enterprise.

176.   The Class is likely to succeed on its merits. The Defendants have and continue to violate the rights of the Plaintiffs and those similarly situated, these are violations of federally protected and Constitutional rights, without the benefit of due process of the law. The Class has been unnecessarily prejudiced by the Governor's restrictions which are not enforced or applied evenly either on a geographic or industry wide basis. Finally, upon inspection by qualified inspectors, Plaintiffs will establish unequivocally that the scientifically proven ventilation upgrades and operating procedures are effective at mitigating and otherwise eliminating the spread of the virus within the Plaintiffs establishment.

177.   Even if considered in a light most favorable to the Defendants, the

Court should issue a temporary injunction because the Plaintiffs have raised serious questions regarding the merits that will require a trial with a balance of hardships clearly tipping in favor of Plaintiffs and others similarly situated. See *Ligon v. City of N.Y.*, 12 Civ. 2274 (SAS), at *11 (S.D.N.Y. Jan. 8, 2013) ("The Second Circuit has held that the moving party may be entitled to a preliminary injunction even if the party is unable to establish a likelihood of success on the merits, provided that the party demonstrates ''a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.'").

178.   An irreparable injury is an injury for which the court could not compensate the movant if the movant prevailed in the final judgment. Injuries that are generally not considered to be "irreparable" include lost income and other economic losses that are calculable and compensable by monetary damages, discharge from employment, litigation costs, and the cost of compliance with government regulations. *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010); *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, No. 18-1960, at *5 (1st Cir. June 11, 2019) (traditional economic damages ordinarily can be remedied by compensatory award and therefore do not rise to the level of being irreparable, but injunctive relief is permissible if

potential economic loss is so great as to threaten the existence of movant's business); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

179.    This Court has previously been persuaded by the reasoning of the decisions that have granted injunctions under circumstances like those presented here. "Monetary damages awarded after the fact do not provide an adequate remedy in a case where the actual loss caused by the infringement cannot be measured precisely." *Bay side Boys*, 2013 WL 5352599, at *7.

180.    The lack of an adequate remedy at law may be demonstrated to the court by showing that alternative remedies are immeasurable or speculative. *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (loss of customer goodwill constitutes immeasurable damage, thereby rendering alternative remedies at law unavailable). An adequate remedy at law may be deemed unavailable if legal redress may be obtained only by commencement of multiple actions, such as when the defendant repeatedly commits the allegedly harmful acts. *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991).

181.    In the current case the balance of equities clearly tips in favor of Plaintiffs and others similarly situated. The Class is facing literal annihilation if no action is taken by this Court. The State will also benefit from the issuance of an

injunction as it will begin to collect lost taxes once sustainable protocols are developed and implemented. See *The Marks Org. Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011) ("Under the Salinger standard, a court must also 'consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.'").

182.   The permanent injunction would serve the public interest by prohibiting the infringing conduct in furtherance of the Plaintiffs' Constitutional Rights. The proposed order will require the Governor to cause the inspection of the Plaintiff's restaurant ventilation system and operating protocols to determine their effectiveness for preventing the spread of the virus and further use the blueprint as a potential protocol for other similarly situated businesses so that they can resume a semblance of normalized operations. See *Living Room Steak House*, 2016 WL 756567, at *7.

183.   Courts will consider the public interest, if any, in granting or denying a motion for preliminary injunction. This can be the predominant factor if the court concludes that the public interest is implicated by the injunction. Courts have focused on the public interest factor where the requested preliminary injunction implicated matters of government or public policy. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Stormans v. Selecky*, 586 F.3d 1109,

1139 (9th Cir. 2009); *Federal Sav. Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987) (upholding preliminary injunction freezing assets of officers and directors of savings and loan institutions who allegedly engaged in wrongdoing, noting the public interests at stake).

184.   "The decision to grant or deny permanent injunctive relief is within the Court's equitable discretion." *eBay*, 547 U.S. at 391, 126 S.Ct. 1837. *Alpha Capital Anstalt v Shiftpixy, Inc.*, 19 CIV. 6199 (PGG), 2020 WL 104697, at *9 [SDN.Y. Jan. 9, 2020]. Traditional equitable considerations weigh in favor of granting the preliminary injunction. The evidentiary record demonstrates that: Plaintiff is likely to succeed on the merits of the claim, Plaintiff is likely to suffer irreparable harm in the absence of preliminary injunctive relief, the balance of the equities tips in the moving party's favor, and an injunction is in the public interest. In determining whether to grant a motion for a preliminary injunction, courts will generally consider the following equitable factors: (a) whether the moving party is likely to succeed on the merits, (b) whether the moving party is likely to suffer irreparable harm in the absence of preliminary relief, (c) whether the balance of equities tips in the moving party's favor, and (d) whether an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008)

**ACCORDINGLY**, we ask this federal court to open indoor dining in New

York City, for and on behalf of the people and the communities wishes and desires and to take the extraordinary actions requested in order to save the lives of the same.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court will:

A. Certify the Plaintiff Class;

B. Declare the relevant Executive Order(s) unconstitutional;

C. Enjoin the relevant Executive Order;

D. Grant a Preliminary Injunction that pauses the Governor, the State, and New York City's enforcement of the Executive Order(s) unless or until:

i. The State and the City of New York inspect the Plaintiff's restaurant and determine the efficacy of the ventilation system and operating procedures as a means of mitigating and otherwise eliminating the spread of the virus; and

ii. The Court reviews the Governor's emergency powers and the Order(s) for constitutionality and legality, as well as investigate the potential of devising and implementing less restrictive, more productive measures like those described herein;

E. Award costs of this action, including attorney's fees to Plaintiffs; and

F. An order granting such other legal and equitable relief as the Court deems just and proper.

Dated:    December 25, 2020
          New York, New York.



*Respectfully Submitted*,


By: */s/ Migir Ilganayev*
MIGIR ILGANAYEV
ATTORNEY FOR THE PLAINTIFFS
139 FULTON STREET, SUITE 801
NEW YORK, NEW YORK 10038
ILGANAYEVLAW@GMAIL.COM


By: */s/ Kian D. Khatibi*
KIAN D. KHATIBI
ATTORNEY FOR THE PLAINTIFFS
99 JOHN STREET, SUITE 2205
NEW YORK, NEW YORK 10038
KIAN@NYSLEGAL.COM



By: /s/ Joseph D. McBride
JOSEPH D. MCBRIDE
ATTORNEY FOR PLAINTIFFS
99 PARK AVE, 25TH FLOOR
NEW YORK, NY 10016
JMCBRIDE@MCBRIDELAWNYC.COM

**VERIFICATION**

I, KIAN D. KHATIBI, ESQ., declare as follows:

1.      I am the president of The Greater New York Merchants' Alliance (GNMA) and managing member and president of Hopkins Hawley LLC d/b/a SEAPORT HOUSE.

2.      I have personal knowledge of GNMA, SEAPORT HOUSE, and COSTIN TARSOAGA and their activities, including those set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning GNMA, SEAPORT HOUSE and COSTIN TARSOAGA, and their planned activity are true and correct.

Executed on December 25, 2020.

 /s/ Kian D. Khatibi
KIAN D. KHATIBI
ATTORNEY FOR THE PLAINTIFFS
99 JOHN STREET, SUITE 2205
NEW YORK, NEW YORK 10038
KIAN@NYSLEGAL.COM