**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

d/b/a **SEAPORT HOUSE (HOPKINS HAWLEY LLC), THE**
**GREATER NEW YORK MERCHANTS' ALLIANCE,** and
**COSTIN TARSOAGA,**
On behalf of themselves and all others similarly situated,

**1:20-cv-10932-PAC**

Plaintiffs,

-against-

**ANDREW CUOMO**, in his personal and official capacity as
Governor of the State of New York, **THE NEW YORK CITY**
**DEPARTMENT OF FINANCE, THE NEW YORK CITY**
**SHERIFF'S DEPARTMENT,** and **MAYOR BILL De BLASIO** in
his personal and official capacity as Mayor of New York City,

Defendants.

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN**
**SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION                                                                   p. 1

    Dr. Blog's deposition reveals the limits of her knowledge of current          p. 7
    science on the subjects concerning the transmission of the virus.

    Connectivity and the nature of interactions have greater impacts on            p. 11
    the spread of the virus than population density.

    The State of New York's contact tracing is flawed yet it still highlights      p. 12
    the fact that a miniscule percentage of positive tests can be traced back
    to restaurants.

    Indoor dining and other restrictions lead to infected individuals isolating   p. 13
    with family and neighbors.

    The sworn deposition of Jeffrey Minner further illustrates the effectiveness  p. 14
    of a properly ventilated environment for the mitigation of the virus.

    There is a substantial likelihood that Plaintiffs claims will succeed on the   p. 15
    merits and prevail on their constitutional claims.

CONCLUSION                                                                     p. 16

**<u>INTRODUCTION</u>**

Representative Plaintiffs respectfully submit this Supplemental Memorandum of Law in Support of their Motion for Preliminary Injunction pursuant to Judge Crotty's order and FRCP Rule 15(d).

Representative Plaintiffs' ongoing discovery of the State's information has uncovered evidence in the forms of studies conducted during the current pandemic and Representative Plaintiffs have submitted expert testimony that focuses on the fact that residential and similar environments are linked to greater transmission rates than indoor dining,[1] and that population **<u>density is not as determinant a factor in the spread of the virus as has been stated by Defendants., if at all. This factor is admitted in Dr. Debra S. Blog's declaration in opposition to this urgent request.</u>**[2]

In support of their instant motion for a Preliminary Injunction, Representative Plaintiffs submit the sworn declaration of leading international medical expert **<u>Dr. Qanta A. Ahmed, MD, FACP, FAASM</u>** (attached hereto as **Exhibit A**) a healthcare professional who came out of retirement to work on the frontline of the provision of critical care medicine to critically ill COVID-19 patients. Dr. Ahmed assisted Representative Plaintiffs in further understanding the discrepancies and failures of the State and City of New York's respective **<u>contact tracing programs, positivity rate calculations, the ineffectiveness of indoor dining and other restriction</u>**s, and as a result further enhanced Representative Plaintiffs' understanding of the

---

[1] "Lost on us at that time early in the pandemic was the highly significant element of household transmission which had escalated disease transmission in households seeded with infection just as the shelter in place orders were enforced and the sheer contagion of the virus not through mere aerosolization of coughs sneezes and other secretions but direct airborne transmission of suspended viral matter." <u>Declaration of Dr. Ahmed</u> (cited herein as "Dr. Ahmed Dclr.")

[2] Journal of the American Planning Association (2020), (preliminary study finding no correlation between density and COVID-19 infections, but finding that "connectivity between counties matters more than county density for pandemic spread and lethality" and that "[t]he more connected the places (either compact or sprawling) in large metropolitan areas are, the harder they are hit by the pandemic").

flawed science that supports the Governor's restrictions against indoor dining.[3] Through deposition Representative Plaintiffs have uncovered contradictions in the information and data presented by Dr. Blog in her declaration.[4] These contradictions along with additional relevant facts further support Plaintiffs' assertions that the Governor's Executive Orders and restrictions on indoor dining lack scientifically supported evidence and are inherently dangerous to the citizens that they are intended to protect. Finally, Representative Plaintiffs have supplemented the scientific evidence of the effectiveness of various ventilation and other methods as a means of mitigating and eliminating the transmission of viruses such as COVID-19.

Representative Plaintiffs request that the Court take judicial notice of the verified affidavit of Jeffrey Minner as filed in re: *Amherst Pizza and Ale House, Inc. et al vs. Cuomo et al,* State of New York Supreme Court: Erie County, NYS Sup Ct. Index No. 816373/2020 attached hereto as **Exhibit B** (hereinafter "Minner Affidavit"). See *Cody v. Charter Commc'ns, LLC*, No. 17-CV-7118 (KMK), at *6 (S.D.N.Y. July 6, 2020) ("Specifically, 'courts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.'"); *Nestle Waters N. Am., Inc. v. City of N.Y.*, 15-cv-05189 (ALC), at *7 (S.D.N.Y. May 25, 2016) ("Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions.").

His Honor opined in this case that "... the Court also finds the public interest factor to weigh in favor of denying the TRO request. As the Supreme Court recently explained, "Stemming the spread of COVID-19 is unquestionably a compelling interest." See *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). "And judges are not public

---

[3] Dr. Ahmed worked in the ICU at Mineola Hospital in Long Island, NY where the first COVID patients were treated in the State.

[4] Dr. Blog deposition transcript attached hereto as "Exhibit A". (cited herein as Dr. Blog Dep.).

health experts and should respect the judgment of those with special expertise and responsibility in this area." citing *Agudath Israel*, No. 20-3572, 2020 WL 7691715, at *10. and that this Court will presume the policy is valid until a more complete record indicates otherwise. citing *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020) (C.J. Roberts, concurring). This supplemental memorandum affords this Court the "more complete record" that it described with hopes that it will in turn rely on this mountain of scientific evidence that supports the Plaintiffs' claims in issuing a preliminary injunction.

### RULE 8 ADMISSION OF FACTS FROM THE STATE OF NEW YORK *ET AL*.

The Federal Rules of Civil Procedure (FRCP), "Rule 8. General Rules of Pleading" do have effect on this instant proceeding and the Defendants' responses indicate not only tacit and legal admissions of the the facts alleged (which allows Representative Plaintiffs to assert all the facts contained in Complaint to be deemed true and correct) in our complaint. It is also true that Representative Plaintiffs have proven their case, met their high burden, and **have submitted overwhelming evidence** to this Court that a Preliminary Injunction in this case is not only warranted but Constitutionally mandated, according to both law and equity.

### RULE 8 AS APPLIED TO THE INSTANT CASE :

The FRCP instructs on this matter, as follows (Representative Plaintiffs comments indicated in underline bold s below):

***(b) Defenses; Admissions and Denials.

(1) In General. In responding to a pleading, a party must:
(A)     state in short and plain terms its defenses to each claim asserted against it;.

**Representative Plaintiffs by and through their Verified Complaint, ECF Doc. No. 1 have alleged plausible facts**.

(B) admit or deny the allegations asserted against it by an opposing party. \

**Defendant Cuomo (_et al._), by and through his attorneys has not presented any written or memorialized rebuttal to our facts alleged. See ECF Doc. No 37: Governor Andrew M. Cuomo's Memorandum Of Law In Opposition To Plaintiffs' Motion For A Preliminary Injunction. The document contains no line item or other factual averments contrary to Representative Plaintiffs alleged facts in this federal action. Statements contained in that document such as "no clear substantial likelihood," Page 2, para. 3, "Plaintiff's seek to undermine these efforts", Page 1, para. 3, and "Plaintiffs seek to undermine \*\*\*Cuomo's Executive Orders designed to mitigate the significant risks of COVID-19 transmission posed by indoor dining" are not factual averments sufficient to satisfy the FRCP mandate**.

(2) <u>Denials—Responding to the Substance</u>. A denial must fairly respond to the substance of the allegation.

**Absent in Governor Cuomo's responsive papers**.

(3) <u>General and Specific Denial</u>s. A party that intends in good faith to deny all the allegations of a pleading—including the jurisdictional grounds—may do so by a general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted.(Defendants failed to respond).

**Absent in Governor Cuomo's responsive papers**.

(4) <u>Denying Part of an Allegation</u>. A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest. (Defendants failed to respond even in part).

**Absent in Governor Cuomo's responsive papers. The general and conclusive legal arguments in Governor Cuomo's responsive papers cannot serve to satisfy this subsection of the FRCP**.

(5) <u>Lacking Knowledge or Information</u>. A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial. (Defendants failed to allege lack of knowledge).

**Absent in Governor Cuomo's responsive papers**.

(6) <u>Effect of Failing to Deny</u>. An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided.

**Responsive pleadings were required in this important federal action and FRCP Rule 8(b)(6) mandates that "is admitted" and this request for Preliminary Injunction should be granted forthwith**.

(c) A<u>ffirmative Defenses</u>. (NONE WERE PRESENTED).

    (1) In General. In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

- accord and satisfaction;
- arbitration and award;
- assumption of risk;
- contributory negligence;
- duress;
- estoppel;
- failure of consideration;
- fraud;
- illegality;
- injury by fellow servant;
- laches;
- license;
- payment;
- release;
- res judicata;
- statute of frauds;
- statute of limitations; and
- waiver.

**Absent in Governor Cuomo's responsive papers**.

---

**DR. DEBRA S. BLOG'S DECLARATION *(ECF DOCUMENT 38: CASE: 1:20-CV-10932-PAC)***.

    As indicated in Representative Plaintiffs Reply, *ECF Doc. No. 44*, Representative Plaintiffs' counsel has thoroughly reviewed the submitted Declaration of Epidemiologist Dr. Debra S. Blog, Director of the Division of Epidemiology for the New York State Department of Health, and the signatory of the sworn **SOLE Declaration submitted in support of Governor Cuomo's opposition papers**. *See ECF Document 38: Case: 1:20-cv-10932-PAC.* Plaintiffs, with the advice and counsel of well-qualified medical experts, are generally in agreement with the

conclusions of the medical reports cited by Dr. Blog and adopt as our own the following

uncontroverted facts:

- The spread of SARS-CoV-2 is particularly efficient in "indoor settings with **poor ventilation**." P. 3, ¶ 10;

- "The CDC recommends **modifying layouts and procedures** to allow for social distancing, including reduced seating capacity to allow for social distancing." **P. 5, ¶ 16**;

- Restaurants **without** windows or a ventilation system can increase spread dramatically. **P. 6, ¶ 20**;

- The "key factor [in containing the spread] is **airflow**." **P. 6, ¶ 23**.

- In order "[t]o prevent spread of COVID-19 in restaurants, we recommend strengthening **temperature-monitoring surveillance, increasing the distance between tables, and improving ventilation**." **P. 7, ¶ 23**;

- The CDC informs that the highest risk restaurants are ones with "[s]eating capacity **not** reduced and tables not spaced at least 6 feet apart." Id. (Emphasis in original.) **P. 10, ¶ 35**;

- The restaurant industry presented a "complex case in which the economic interests and the need to supply food to NYC need[s] to be carefully balanced." **P. 11, ¶ 39**;

- "Typical restaurant service is not an appropriate comparator for typical bar behavior/service." **P. 11, ¶ 40**;

- The CDC recommends, "[restaurants and bars can determine, **in collaboration with state and local health officials**, whether and how to implement these [safety protocol] considerations, making adjustments to meet the needs and circumstances of the local community. Implementation should be guided by what is feasible, practical, acceptable, and **tailored to the needs of each community**." **Exh. Z. P. 12 ¶ 43**.

- In the case of "**ordinary restaurant service**, the customers arrive and leave at different times with the main purpose of enjoying a meal. In contrast, at a bar, the purpose of going to a bar is to consume alcoholic beverages over a period of time, a fact that increases the chances of further mingling and transmission of the virus." **P. 12, ¶ 44**.

- "[T]he WHO['s] focus on improving ventilation and air filtration in public places such as bars." In the "**absence of effective ventilation**, the virus can fill a bar in a matter of hours." **P. 12-13, ¶ 46**.

- Generally, **food service after midnight** is more similar to a bar experience where patrons tend to gather and mingle rather than a restaurant experience. In ordinary restaurant dining, customers can be expected to finish a meal within an hour or two. A lengthy period of time occupying the same space is an important factor in increased risk of transmitting the COVID-19 virus. Having food and beverage services end at midnight discourages individuals from continuing to mingle after they have finished eating. **P. 13-14. ¶ 51**.

Representative Plaintiff Seaport House has taken every step and beyond indicated above and more.[5] The State Government can easily impose executive or legislative measures that direct that the operations and ventilation systems which are designated to be "CDC Compliant," and/or COVID-19 medically compliant. This answers, in favor of Plaintiffs, the question of the State mandate to resolve constitutional infringements with the least restrictive means and their contrary conclusion cannot logically be data-driven.[6]

---

[5] Please see Dr. Qanta Ahmed's Declaration, attached as **Exhibit A** to this Supplemental Memorandum of Law: **Finding Specific To Seaport House Restaurant**, P. 56, ¶ 224, stating, "Reviewing the floor plan, attached as Exhibit C to Plaintiff's Complaint, CEF Doc. No.: 1: I am humbled by the efforts the Plaintiff restaurant Seaport House has made to safeguard its clientele and employees. We note that the business owner has deployed open windows and doors which allow for a cross current of air to continually aerate the premises. The kitchen exhaust hood has been reconfigured to expel air into the outdoors therefore extracting fumes but also magnifying the cross current of air constantly moving from the open doors and windows which remain open while indoor and outdoor dining might occur and always drawing in a current of fresh air from the outdoors. The placement of barrel fans prevent exhaust air from recirculating into the seating area."

[6] Mr. Jeffrey Minner is a mechanical engineer who recently retired as Chief Engineer for General Motors, Lockport Division. Mr. Minner was engaged to perform a scientifically controlled analysis of air exchange in indoor dining venues in the Western New York Area. See Amherst et al. Mr. Minner conducted the tests at different locations and at different times to ensure the repeatability of the results. The results of these tests showed that the ventilation (ACH) of indoor dining venues were superior to air flow in a typical home by a multiple of 50. See **Exhibit B.** The information contained in Mr. Minner's report along with other compelling evidence led the Court in that case to reopen indoor dining. The Plaintiffs in this case have gone exceedingly beyond the ventilation protocols tested by Mr. Minner and should therefore be considered even more superior in air flow and ventilation than the typical residence and therefore far more likely to cause spread. See Affidavit of Jeffrey Minner, attached as Doc. No 107 on NYSCEF in the case Amherst Pizza and Ale House, Inc. et al vs. Cuomo et al, State of New York Supreme Court: Erie County, Index No. 816373/2020, attached hereto as **Exhibit B**.

## DOCTOR S. BLOG'S BIFURCATED DEPOSITION.

Dr. Debra S. Blog, Director of Etymology for New York State's Department of Health, deposed and was cross-examined by Representative Plaintiffs' attorneys on January 24, and January 25, of this year. Those factual averments disclosed in those depositions are marshalled, as follows:

**Dr. Blog's deposition reveals the limits of her knowledge of current science on the subjects concerning the transmission of the virus**

According to Dr. Debra S. Blog, MD, who was deposed under oath beginning at 4:00 *post-meridian* on January 24, 2021 (attached hereto as **Exhibit C**), the following can incorporated as both admitted facts and, as well, adopted and incorporated into Representative Plaintiffs' pre-trial instant motion for a Preliminary Injunction against Governor Cuomo's oppressive mandates, the latest of which is styled as "Executive Orders," *re*: NYS Executive Order 202.81," Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," which states in relevant part: The directive contained in Executive Order 202.61 as continued in Executive Order 202.79 is hereby modified to suspend authorization for indoor dining within New York City effective on Monday December 14, 2020.

To begin, we marshal the only rebuttal submitted against Representative Plaintiffs' complaint, that of Dr. Debra S. Blog, as follows:

Initially, on January 24, 2021, Dr. Blog deposed that her testimony would be congruent with this City's search for the truth: *Deposition transcript, January 24, 2021, Page 7, L. 20 - 23.*

Substantive deposition of New York State's Director of Etymology began with a respectful directive to Dr. Blog to explain the State of New York's understanding of "the amount

of viral load that a person's (NYC residents)  body takes – *vis-a-vis* – the timeline that it takes it in [COVID-19 on a person's body] and the effects that it would have on people." The answer of The State of New York's representative was "not sure." *See Deposition transcript, Page 10, l. 3-25, Page 11, L. 2.*

Also indicated through deposition is that, New York State's pandemic response mechanisms do not contemplate contemporary peer-reviewed medical data or other substantive and, now, well-accepted pandemic response measures. Moreover, the State's purported factual defense expert informed that the State of New York has zero factual knowledge, re: the "Temporal Viral Load" indicators, also known in certain medical circles as "Infectious Dose" or "Initial Viral Load." [7]

Moreover, Dr. Blog deposed that she was unfamiliar with any of these terms or The State of New York's applications of these basic medically indicated principles:[8]

As well, New York State's factual counter argument to Representative Plaintiffs' exigent request to this Federal Court for the traditional protections granted.

Dr. Blog admitted zero knowledge of The State of New York, or its policy makers, as to the medically indicated and data-driven methods that our population has learned from the 1918 swine flu pandemic or the 1947 smallpox pandemic.[9]

---

[7] < https://www.tandfonline.com/doi/pdf/10.1080/01944363.2020.1777891?needAccess=true& >

[8] *See Deposition transcript, January 24, 2021, Page 10, L. 3-25, Page 11, L. 2.*

[9]  In the aftermath of the 1918 pandemic, historians described and memorialized  the significant importance of preventing pandemics through "common sense." *See Deposition transcript, Page 12.  L. 15-25, Page 13, L. 2-4* <https://www.telegraph.co.uk/global-health/science-and-disease/1918-spanish-flu-pandemic-helped-shape-coronavirus-action-plan/> (accessed January 28, 2021).

Additionally, the State's defense to our well-pled request for a Preliminary Injunction in this important matter before this Court, admits zero knowledge of and zero inclusion into the decision making process of the lessons learned from the 1947 smallpox pandemic in styling New York State's oppressive Executive Orders. *See Deposition transcript, Page 16.  L. 20-25, Page 17, L. 2-17.*

Dr. Blog also attested to the inability of the State to determine whether **<u>DENSITY</u>** in a population center is a contributing factor in either the spread of SARS-CoV-2 (COVID-19) – the State of New York's only remaining logical argument that could plausibly be considered medically indicated, or serve as a rational basis for the oppressive Executive Orders instituted by Governor Cuomo. *See Deposition transcript, January 24, 2021, Page 17.  L. 12-25, Page 17-25, Page 18. L. 2-25, Page 19. L. 2-25.* Even in hard-hit New York City, Manhattan has maintained the lowest COVID-19 rates among the city's five boroughs, despite having the highest population density. Meanwhile some lower-density neighborhoods in Queens and the Bronx have seen higher rates of infection and death.[10]

Moreover, Dr. Blog indicated that her only objection to not dining outdoors after the 10 *post-meridian* curfew is that she is "generally not out late," without recitation of any opposition to, at least, midnight outdoor dining in New York.  *See Deposition transcript, January 24, 2021, Page 28.  L. 15-25*

**THE STATE OF NEW YORK DID NOT SUBSCRIBE TO THE DECLARATION OF DEBRA S. BLOG IN OPPOSITION TO REPRESENTATIVE PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION AGAINST THE STATE OF NEW YORK'S OPPRESSIVE <u>EXECUTIVE ORDERS</u>.**

---

[10] "Population Density Does Not Doom Cities to Pandemic Dangers: Crowding, Connections and Other Factors Seem to Better Explain Infection and Mortality Rates", Jeremy Hsu (September 16, 2020) Scientific American

Dr. Debra S. Blog, who was again deposed under oath beginning at 4:00 *post-meridian* on January 25, 2021 (attached hereto as **Exhibit D**).

The State, by and through their declaratory signature served in opposition to Representative Plaintiff's instant motion, admits that Susan Cartier, attorney for the Department of Health of The State of New York wrote most, if not all of Dr. Debra S. Blog's Declaration in support of Defendant Cuomo's opposition to Plaintiff's instant motion. Moreover, Representative Plaintiffs allege herein and will seek to amend the primary complaint in this action to include our *bona-fide* claim that defendant Governor Cuomo's administration presented a rebuttal in this instant federal action which was not identical to the purported authority claimed in the opposition papers and which the oppressive Executive Orders had laid its foundation on.[11]

Governor Cuomo's restrictions continue to violate the Dormant Commerce Clause. Cuomo recently stated in an interview. "the state is being proactive, as it has recently been able to identify that indoor dining is the fastest growing source of the spread of COVID-19. Restaurants are one of the few areas we think we can actually make a difference," said Cuomo at a press conference Friday, adding that his government felt they had less control over the spread through other sources like **air travel**." This statement confirms that Cuomo's actions are in violation of the dormant commerce clause. See *United Haulers Assn., v. Oneida-Herkimer Solid Waste*, 550 U.S. 330, 339 (2007) ("To determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce.") *Granholm v. Heald*, 544 U.S. 460, 493 (2005) (" If a State chooses to allow direct shipment of wine, it must do so on even handed terms. Without demonstrating the need for discrimination, New York and Michigan have enacted regulations that disadvantage out-of-state wine producers. Under our Commerce Clause jurisprudence, these regulations cannot stand.");

---

[11] *See Deposition transcript, January 25, 2021, Page 82.  L. 10-25, Page 83 L. 2-8, Page 84. L. 2-20.*

see also Peake *v. Town Board of Hancock*, 93 F.3d 68, 75 (2d Cir. 1996) ("The Court explained that the ordinance improperly suppressed competition in the waste processing market by "hoard[ing] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility. Accordingly, the Court held that the ordinance violated the dormant Commerce Clause.")

1.  **Connectivity and the nature of interactions have greater impacts on the spread of the virus than population density.**

Studies like this suggest, with scientific evidence, that it is not population density, but the way people interact, or connectivity that has the greater impact on the spread of the virus. Dr. Hamidi who contributed to the Scientific American study  looked at some of the confounding factors—metropolitan size, socioeconomic status of residents, quality of health care and adoption of social distancing—when analyzing how density affects COVID-19 spread and mortality in more than 900 U.S. counties. She and her collaborators at the University of Utah found that county density had no significant relationship with infection rate. In fact, higher-density counties were associated with *lower* mortality rates, possibly because residents were more strictly following social-distancing guidelines or had better access to health care. "If you want to move to a rural area to be safe from getting COVID, maybe [that helps] because you have fewer contacts," says Brooke Nichols, a health economist at Boston University, who was not involved in the study. "But in terms of mortality, you might actually be at a greater risk because there may not be the services there to support you."

One of the biggest predictors of infection rate was metropolitan size—a factor that the researchers see as reflecting the number of metropolitan area counties that are intricately linked by community, transportation, housing, and economic relationships. And the implication that this kind of connectivity among communities may play a significant role in the spread of the novel

coronavirus was strengthened in a follow-up longitudinal study.[12] It showed that larger metropolitan size was linked to higher infection and mortality rates over time, whereas higher population density (without that confounding factor) was linked to lower infection and mortality rates over the same period.

2. **The State of New York's contact tracing is flawed yet it still highlights the fact that a miniscule percentage of positive tests can be traced back to restaurants.**

In her declaration, Dr. Ahmed stated that the State of New York reported 46,000 data points that were collected from contact-tracing between September and November 2020.[13] This is 46,000 cases that have been traced while an additional 200,000 cases have been reported and remain untraced. Barely 1.4% of cases that were traced successfully were related to restaurant exposure. "Additionally, the vast majority of infections cannot be traced to their point of contact in New York State is also likely indicating most cases cannot be traced to the restaurant and hospitality industry. This again would be in keeping with the academic literature which shows extensive transmission is foremost within the household." See Dr. Ahmed Declr. Pg. 15 (**Exhibit A**).

'The United States is in a particularly dire situation. "Public-health authorities are struggling to reach cases and contacts" despite aggressive efforts, says John Oeltmann, head of contact-tracing assessment at the US Centers for Disease Control and Prevention (CDC) in Atlanta, Georgia. He and his team evaluated two counties in North Carolina. In June and July, 48% of cases in one county and 35% in the other reported no contacts. Of the contacts whose details were provided, one-quarter in one county and almost half in the other couldn't be reached

---

[12] "Longitudinal Analysis of the Relationship Between Development Density and the COVID-19 Morbidity and Mortality Rates: Early Evidence from 1,165 Metropolitan Counties in the United States", S. Hamidi, Reid Ewing, (July 2020) Health and Place, vol. 64, Science Direct

[13] Governor Cuomo made these remarks in an interview on December 11, 2020.

on the phone after three attempts over consecutive days[2]. In New Jersey, just 49% of cases between July and November were contacted; only 31% of those provided any contact details. "These results are not rare," says Oeltmann.

The New York Times has reported that workers in New York City's contact tracing programs have complained of 'crippling communication and training problems.' Ideally contact tracing should track individuals who have spent 15 minutes or more within six feet of an infected person, trace their contacts and isolate and quarantine accordingly. The sheer number of infected and impacted individuals, delays in access, and turnaround time of testing and widespread dissemination of the pandemic have impeded successful contact tracing in the United states including in New York. These limitations together with the unpalatability to democracies of geolocation technology, close circuit television and credit card footprints of index case patients in the United States- though widely deployed in South East Asia - renders real-time contact tracing, tracking, isolation, and quarantine pragmatically unfeasible at this advanced stage of the pandemic.

### 3. Indoor dining and other restrictions lead to infected individuals isolating with family and neighbors.

There is no data or information that defines what people do when restaurants are closed. The logical assumption is that they retreat to their homes (if they have one) where they are in close proximity to family and close friends for untold periods of time. As illustrated in the following (2) reports, when indoor dining is closed, the spread of the virus has gone up. See https://forward.ny.gov/daily-hospitalization-summary-region, https://forward.ny.gov/percentage-positive-results-region-dashboard.

Studies have shown that there is no attempt within these private spaces to employ social distancing or other protocols. In fact, Dr. Ahmed pointed out that "if lock down measures are

implemented but the infection has already seeded a particular household, disease transmission will continue and increase serially and amplify even as community disease diminishes. This may be the reason why even though indoor dining has remained entirely closed in New York City since December 14th 2020 by the State's own medical expert, prevalence of COVID-19 in New York City continue to rise as described in the affidavit by my colleague Dr. Debra S. Blog." See Dr. Ahmed Declr. pg. 25. (**Exhibit A**).

Central to pandemic propagation is the overlooked and neglected role of household transmission including here in New York State and New York City. In several studies scientists have noticed that community transmission will be ongoing depending on the extent of household-to-household contacts- consider parents and grandparents being in contact with each other in different households- and household to community contacts – an essential worker who is the breadwinner in the family but needs to go out to the workplace while the household contacts isolate and shelter in place during lockdown orders. See *Id.* pg. 15.

4. **The sworn deposition of Jeffrey Minner further illustrates the effectiveness of a properly ventilated environment for the mitigation of the virus.**

Mr. Jeffrey Minner is a mechanical engineer who recently retired as Chief Engineer for General Motors, Lockport Division. Mr. Minner was engaged to perform a scientifically controlled analysis of air exchange in indoor dining venues in the Western New York Area. See *Amherst et al.* Mr. Minner conducted the tests at different locations and at different times to ensure the repeatability of the results. The results of these tests showed that the ventilation (ACH) of indoor dining venues were superior to air flow in a typical home by a multiple of 50. (See **Exhibit B**). The information contained in Mr. Minner's report along with other compelling evidence led the Court in that case to reopen indoor dining. The Plaintiffs in this case have gone exceedingly beyond the ventilation protocols tested by Mr. Minner and should therefore be

considered even more superior in air flow and ventilation than the typical residence and therefore far more likely to cause spread.

**5.  There is a substantial likelihood that Plaintiffs claims will succeed on the merits and prevail on their constitutional claims.**

The statements and testimony provided by Dr. Blog stand in stark contrast to the growing body of scientific studies that have been conducted during the current pandemic. Plaintiffs have raised significant questions that go to the merits of the case. While the moving party must set forth evidence to support a likelihood of success on the merits, this factor is not dispositive in determining whether to grant injunctive relief. The moving party does not need to demonstrate an absolute certainty of success in order to prevail. See *Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). In a case involving Constitutional Rights violations, a showing of a substantial likelihood of success on the merits often also establishes irreparable harm. Thus, a showing of substantial likelihood of success on the merits can be the determining factor that warrants the issuance of a preliminary injunction. See *Sindicato Puertorriqueño De Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012); *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007). Plaintiffs in the current case have raised significant questions that go the merits of the case, established a likelihood of success on the merits, established that irreparable harm will continue in the absence of injunctive relief, and that the balance of equities tips decidedly in favor of Plaintiffs (as the current restrictions have been shown with scientific support to be harmful to the public health).

**"But even in a pandemic, the Constitution cannot be put away and forgotten."** See *Roman Catholic Diocese of Brooklyn, NY vs. Cuomo et al,* 509 US 2020.

**CONCLUSION**

As of the filing of this action and its subsequent proceedings, the Governor has hinted on January 27, 2021, that he intends to lift restrictions and permit indoor dining to reopen. Plaintiffs and those similarly situated intend to continue to pursue this action until it is adjudicated on its merits in this Court as the Governor has opened and closed indoor dining previously. Plaintiffs also request that they be granted legal fees in addition to the preliminary injunction and other equitable relief sought herein.

Dated: January 27-28, 2021
      New York, New York

Respectfully submitted,

_/s/_ **MIGIR ILGANAYEV**
MIGIR ILGANAYEV
*Attorney for the Plaintiffs*
139 Fulton Street, Suite 801
New York, New York 10038
ILGANAYEVLAW@GMAIL.COM

_/s/_ **KIAN D. KHATIBI**
KIAN D. KHATIBI
*Attorney for the Plaintiffs*
99 JOHN STREET, SUITE 2205
New York, New York 10038
KIAN@NYSLEGSAL.COM

## CERTIFICATE OF SERVICE

I hereby certify that, on January 28, 2021, I electronically filed this Plaintiffs' Supplemental Memorandum Support of their Motion for Preliminary Injunction and other Equitable Relief with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing (NEF) to all registered participants and that paper copies will be sent to those counsel listed as non-registered participants on this same date.

*/s/* **MIGIR ILGANAYEV**
MIGIR ILGANAYEV
*Attorney for the Plaintiffs*
139 Fulton Street, Suite 801
New York, New York 10038
ILGANAYEVLAW@GMAIL.COM

*/s/* **KIAN D. KHATIBI**
KIAN D. KHATIBI
*Attorney for the Plaintiffs*
99 JOHN STREET, SUITE 2205
New York, New York 10038
KIAN@NYSLEGSAL.COM