UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
HOPKINS HAWLEY LLC d/b/a SEAPORT         :
HOUSE, THE GREATER NEW YORK              :
MERCHANTS' ALLIANCE, and COSTIN          :
TARSOAGA, on behalf of themselves and all :
others similarly situated,               :          20-cv-10932 (PAC)
                                         :
                    Plaintiffs,          :
                                         :          OPINION & ORDER
            -against-                    :
                                         :
ANDREW CUOMO, in his personal and        :
official capacity as Governor of the State of :
New York, THE NEW YORK CITY              :
DEPARTMENT OF FINANCE, THE NEW           :
YORK CITY SHERIFF'S DEPARTMENT,          :
and BILL DE BLASIO, in his personal and  :
official capacity as Mayor of the City of New :
York,                                    :
                                         :
                    Defendants.          :
------------------------------------------------------------X
```

In response to a second surge of COVID-19 infections, Governor Andrew Cuomo issued executive orders restricting restaurant dining across the state. Restaurants in New York must close at 10 PM and restaurants in New York City cannot serve customers indoors. The Plaintiffs, whose livelihoods depend on the restaurant industry, have suffered greatly from these restrictions. They have experienced substantial losses in revenue and are at risk of closing up shop permanently. They now seek a Preliminary Injunction enjoining Governor Cuomo's dining restrictions on the grounds that the restrictions violate the federal Constitution and that the public interest would be better served without them. For the reasons set forth below, these arguments are rejected and the Preliminary Injunction motion is **DENIED**.

## BACKGROUND

### I.      The COVID-19 Pandemic

The COVID-19 pandemic has caused innumerable human death and suffering in the state

of New York.  To date, more than 1.4 million New Yorkers have contracted the COVID-19 virus

and more than 44,000 have died as a result.  *See New York Coronavirus Map and Case Count*,

N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html

(updated Feb. 8, 2021).  In New York City alone, over 27,000 people have succumbed to the

virus.  *See United States COVID-19 Cases & Deaths by State*, Ctrs. for Disease Control &

Prevention, https://covid.cdc.gov/covid-data-tracker (updated Feb. 7, 2021).  At its peak, New

York experienced "more coronavirus cases than any single country in the world."  (Dr. Blog

Decl. ¶ 74, ECF 40.)

With the aid of stringent public health measures, New York was able to successfully

flatten the curve of infections during the summer of 2020.  Beginning in the fall, however, the

state confronted a second wave of infections.  (*See* Dr. Varma Decl. ¶ 17, ECF 36.)  In

September, the state averaged a 50% increase in daily infections.  (*Id.*)  And that number

continued to rise after the end-of-year holiday season.  (*Id.* ¶¶ 17–18.)

### II.     The Dining Policy

In response to the second surge in COVID-19 infections, Governor Cuomo issued two

executive orders that increased restrictions on restaurant dining across the state.  These

restrictions (the "Dining Policy") provide that:[1]

---

[1] Governor Cuomo has issued a slew of restrictions on restaurant dining since the onset of the
pandemic.  In March 2020, he issued Executive Order 202.30 which prohibited indoor dining
across the state.  (City Br. at 5, ECF 35.)  In June 2020, he issued Executive Order 202.41 which
allowed indoor dining at 50% capacity in certain regions of the state (but not New York City).
(*Id.* at 6.)  In September 2020, Governor Cuomo lifted the indoor dining ban on New York City

- **E.O. 202.74:**    All restaurants in New York State must cease both indoor and outdoor dining at 10 PM, effective November 13, 2020.

- **E.O. 202.81:**    All restaurants in New York City must suspend indoor dining, effective December 14, 2020.

(*See* Schonfeld Decl. Exs. H & I ("Executive Orders"), ECF 34.)

The Dining Policy aims to slow the further spread of the COVID-19 virus.  According to public health authorities, indoor dining increases the risk of COVID-19 transmission because of its poor ventilation and lack of social distancing, and the unmasked face-to-face exposure that occurs while eating and drinking.  (*See* Dr. Blog Decl. ¶¶ 8–59; Dr. Varma Decl. ¶¶ 33–44.) Because respiratory droplets of the virus can spread through close contact with others as people cough, sneeze, talk or sing, public health experts have classified indoor dining as a higher-risk activity.  (*See* Dr. Blog Decl. ¶¶ 11, 16; Dr. Varma Decl. ¶ 30.)  In a report released last September, the Centers for Disease Control and Prevention (CDC) found that adults who dined out were approximately twice as likely to contract COVID-19 as those who did not.  (Dr. Blog Decl. ¶ 26.)  Additionally, experts also say the risk of transmission is further supplemented in a densely populated metropolis like New York City.  (*See* Dr. Blog Decl. ¶¶ 34–38; Dr. Varma Decl. ¶ 28.)

The Dining Policy's 10 PM closure rule, which applies both to indoor and outdoor dining, also aims to reduce the spread of the COVID-19 virus.  The rule is premised on the rationale that the later people stay out at restaurants, the more liquor their patrons consume,

restaurants but placed a midnight curfew on all forms of restaurant dining.  (*Id.*)  The Dining Policy has since subsumed each of these regulations.  While many of these regulations have been challenged in court, none have been successful thus far.  *See infra* 7–8.

reducing their inhibitions and making them less likely to adhere to mask wearing and social distancing protocols.  (Dr. Blog Decl. ¶¶ 44–52; Dr. Varma Decl. ¶ 37.)

### III.   Preliminary Injunction Motion

The Plaintiffs are a New York City restaurant, non-profit advocacy group, and restaurant worker[2] whose livelihoods have been affected by the Dining Policy and COVID-19 pandemic at large.  (Compl. ¶¶ 54–58, ECF 1.)

On December 25, 2020, the Plaintiffs filed this class action lawsuit against Governor Cuomo, and the New York City Department of Finance, the New York City Sheriff's Department, and Mayor Bill de Blasio (collectively, "City Defendants").[3]  (ECF 1.)  On December 30, the Plaintiffs moved for a TRO and Preliminary Injunction seeking injunctive relief from the Dining Policy.  (ECF 16.)  After holding a telephonic conference on January 6, the Court denied the TRO application and ordered briefing on the Preliminary Injunction motion. (ECF 32.)  The parties subsequently submitted additional briefing and the Court held oral argument on the Preliminary Injunction motion on January 21.

The Plaintiffs seek a Preliminary Injunction that would enjoin enforcement of the Dining Policy and (1) permit "*bona-fide*"[4] New York City restaurants to operate at 50% indoor dining

---

[2] Seaport House is a restaurant operating in New York City; Costin Tarsoaga is a restaurant worker; and the New York Merchants Alliance is a non-profit advocacy group that represents restaurant owners across New York.  (Compl. ¶¶ 54–56, ECF 1.)

[3] This case was originally assigned to Chief Judge McMahon but reassigned to this Court on January 4, 2021.

[4] At oral argument, the Plaintiffs clarified "bona fide" restaurants as those establishments "with tables seated apart, the windows open" and compliant with "very strict regulations."  (Oral Arg. Tr. at 22, ECF 51.)

capacity and (2) allow all New York restaurants to be able to serve patrons until midnight.[5]  (*See* Pls.' Reply, at 7, ECF 44.)  In support of their motion, the Plaintiffs allege that the Dining Policy deprives them of their Constitutional rights under the (1) the Fourteenth Amendment's Due Process Clause; (2) First Amendment; and (3) Dormant Commerce Clause.  (Pls.' Br. at 8–11, ECF 17.)  And they allege that issuance of the Preliminary Injunction will better serve the public interest and redress their irreparable harms.  (*Id.* at 11–14.)

Governor Cuomo and the City Defendants oppose the Preliminary Injunction motion. They argue that under the Supreme Court's holding in the 1905 case, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), state and local authorities must be granted substantial deference in addressing the COVID-19 pandemic.  (State Br. at 12–14, ECF 41; City Br. at 9–13, ECF 35.) Alternatively, they contend that even if deference is not afforded, the Dining Policy withstands Constitutional scrutiny under a traditional doctrinal analysis.  (State Br. at 14–21; City Br. at 13–24.)  Finally, they argue that the Dining Policy is a necessary public health measure against the COVID-19 pandemic and therefore that the public interest factor weighs against granting injunctive relief.  (State Br. at 23–25; City Br. at 25–26.)

---

[5] Although the Plaintiffs point out that Governor Cuomo may soon roll back some of the restrictions challenged on this Preliminary Injunction motion, the matter is not moot because Governor Cuomo has not yet provided all the relief Plaintiffs seek.  Even if he did, however, the matter would not be moot as Plaintiffs are under a "constant threat" of the restrictions being reinstated.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).

Separately, the City Defendants contend that they play a minor role in forming the restrictions Plaintiffs complain of and that, under Governor Cuomo's executive orders, they are required by law to adhere to the Dining Policy.[6]  (City Br. at 8.)

## ANALYSIS

### I.    COVID-19 and Judicial Review

The Court must first address what standard of judicial review to apply to the Plaintiffs' Constitutional claims.  Since the start of the COVID-19 pandemic, many courts have cited the Supreme Court's 1905 decision in *Jacobson v. Massachusetts* and deferred substantially to state and local authorities with respect to their COVID-19 policies.  But recent decisions from the Supreme Court and Second Circuit have placed *Jacobson*'s relevance into question.

### A.    *Jacobson* and Its Progeny

In *Jacobson v. Massachusetts*, the Supreme Court addressed the Constitutionality of a Massachusetts law which required mandatory vaccination in response to the ongoing smallpox pandemic.  197 U.S. at 25.  Plaintiff Henning Jacobson, who was subject to the mandatory vaccination law, sued the state of Massachusetts alleging that his substantive due process right to bodily integrity was being interfered with.  *Id.* at 13–14.  Justice Harlan, speaking for the Court, rejected Jacobson's claim, and held that in times of public health crises, a state or local law "enacted for the public health" would only be struck down if it had "*no real or substantial*

---

[6] At oral argument, the Court asked the City Defendants about the consequences of failing to adhere to Governor Cuomo's executive orders.  (Oral Arg. Tr. at 18–19)  The City Defendants responded that "some kind of penalty" in the form of "contempt" would attach.  (*Id.*)  The Court recognizes the City Defendants' predicament in this case.  Were they to disagree with Governor Cuomo's Dining Policy, they would still have to comply with the directives under state law. (City Br. at 8.)  But if the City Defendants chose not to comply, then, as their counsel suggested, penalties would likely attach.

*relation* to [the public health] or is, beyond all question, *a plain, palpable* invasion of rights

secured by the fundamental law." *Id.* at 31 (emphasis added).

Over a century later, Chief Justice Roberts built on *Jacobson*'s deferential framework in

*South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020).  In a concurring

opinion denying injunctive relief to California churches against Governor Newsom's COVID-19

restrictions, the Chief Justice wrote:

> The precise question of when restrictions on particular social activities should be lifted
> during the pandemic is a dynamic and fact-intensive matter subject to reasonable
> disagreement.  Our Constitution principally entrusts the safety and the health of the
> people to the politically accountable officials of the States to guard and protect.
> *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).

*South Bay*, 140 S. Ct. at 1613 (cleaned up).

The Supreme Court's opinion in *Jacobson* and the Chief Justice's concurrence in *South

Bay* can be read in differing ways.  Read narrowly, the decisions suggest that courts should take

a somewhat deferential approach to Constitutional issues that arise from the COVID-19

pandemic.  Read broadly, however, the decisions support the proposition that during times of

public health crises, the full panoply of Constitutional rights ought not apply and instead, that

*Jacobson*'s deferential legal standard must govern.

Various federal courts in New York have adopted the latter reading of *Jacobson* and

*South Bay*, and rejected Constitutional challenges to Governor Cuomo's COVID-19 restrictions.

*See, e.g.*, *Young v. James*, No. 20 CIV. 8252 (PAE), 2020 WL 6572798, at *3 (S.D.N.Y. Oct. 26,

2020) (rejecting First Amendment challenge to Governor Cuomo's mask mandate because

plaintiff did not show a "plain, palpable invasion of rights secured by the fundamental law");

*Columbus Ale House, Inc. v. Cuomo*, No. 20-CV-4291 (BMC), 2020 WL 6118822, at *3

(E.D.N.Y. Oct. 16, 2020) (applying *Jacobson* and rejecting Constitutional challenges to

Governor Cuomo's executive order requiring restaurants to close at midnight); *Geller v. Cuomo*, 476 F. Supp. 3d 1, 15 (S.D.N.Y. 2020) (rejecting First Amendment challenge to social gathering restrictions).

Yet recent doctrinal developments from the Second Circuit and the Supreme Court have placed this deferential framework in question. The Court will address those developments now.

### B.    *Roman Catholic Diocese of Brooklyn v. Cuomo*

In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court granted temporary injunctive relief to New York-based religious entities against Governor Cuomo's strict capacity limits on in-person services. 141 S. Ct. 63 (2020). In doing so, the Court assessed the plaintiffs' First Amendment free exercise claim under a traditional Constitutional analysis and concluded that strict scrutiny applied because Governor Cuomo's religious restrictions singled out houses of worship. *Id.* at 66–68. Notably, the Court's per curiam opinion did not rely on, let alone mention, *Jacobson* or the Chief Justice's concurrence in *South Bay*. *Id.*

On remand, the Second Circuit converted the temporary injunction into a preliminary injunction, and indicated that *Jacobson* and *South Bay* were no longer the correct legal framework for examining First Amendment free exercise challenges against COVID-19 restrictions. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635–36 (2d Cir. 2020). Judge Park, speaking for the panel, wrote:

> In *Jacobson*, the Supreme Court upheld a mandatory vaccination law against a substantive due process challenge. *Jacobson* predated the modern constitutional jurisprudence of tiers of scrutiny, was decided before the First Amendment was incorporated against the states, and "did not address the free exercise of religion." Indeed, the *Jacobson* Court itself specifically noted that "even if based on the acknowledged police powers of a state," a public-health measure "must always yield in case of conflict with ... any right which [the Constitution] gives or secures."

*Id.* at 635.

Additionally, with respect to the Chief Justice's *South Bay* concurrence, Judge Park opined in a footnote:

> The district courts, motions panel, and Governor also relied heavily on the Chief Justice's concurring opinion in *South Bay*. Whatever persuasive value that opinion may have had in the early months of the COVID-19 pandemic, the Supreme Court's decision in *Roman Catholic Diocese* has supplanted *South Bay*.

*Id.* at n. 20.

*Roman Catholic Diocese* and *Agudath Israel* are binding precedent for this Court.  But the scope of their rulings is unclear.  Have those decisions abrogated *Jacobson*'s relevance in *all* Constitutional cases arising from the pandemic?  *See, e.g.*, *Big Tyme Investments, L.L.C. v. Edwards*, No. 20-30526, 2021 WL 118628, at *10 (5th Cir. Jan. 13, 2021) (Willet, J., concurring) (arguing *Jacobson* has been displaced); *Plaza Motors of Brooklyn, Inc., et al., v. Cuomo*, No. 20CV4851WFKSJB, 2021 WL 222121, at *5 (E.D.N.Y. Jan. 22, 2021) (concluding *Jacobson* had been abrogated).  Or can they be cabined to the free exercise context in which their holdings arose?  *See Delaney v. Baker*, No. CV 20-11154-WGY, 2021 WL 42340, at *12 (D. Mass. Jan. 6, 2021) (applying both *Jacobson* and a traditional Constitutional analysis).

### C.    *Deferential Review*

The Court concludes that *Jacobson*'s deferential standard of judicial review is still applicable.  Although *Roman Catholic Diocese* and *Agudath Israel* raise doubts as to *Jacobson*'s continuing viability, *Jacobson* bears directly on this case and has not been explicitly overruled, which means that this Court is bound by it.  *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *accord Delaney*, 2021 WL 42340, at *12 ("Last month, in *Roman Catholic*

*Diocese of Brooklyn*, the Supreme Court shed some light on this debate without resolving it. Without overruling *Jacobson*, the Supreme Court applied the tiers of scrutiny to enjoin the governor of New York[.]").

In addition to principles of *stare decisis*, the factual circumstances and legal claims in *Roman Catholic Diocese* and *Agudath Israel* are distinguishable from the present case. There, religious entities sought a preliminary injunction enjoining Governor Cuomo's capacity limits on in-person worship services. *Roman Catholic Diocese*, 141 S. Ct. at 66; *Agudath Israel*, 983 F.3d at 624–25. As the basis for their preliminary injunction application, the plaintiffs alleged a free exercise claim, and demonstrated that, under a traditional Constitutional analysis, strict scrutiny would apply to the capacity restrictions in question. *Roman Catholic Diocese*, 141 S. Ct. at 67; *Agudath Israel*, 983 F.3d at 633. Here, in contrast, a completely different public health restriction is challenged, no free exercise claim is at issue,[7] and even under a traditional Constitutional analysis, Plaintiffs' claims would most likely merit rational basis review.[8] *See infra* 10–14. Thus because these facts more directly align with those found in *Jacobson*, the Court concludes that it must apply *Jacobson*'s deferential legal standard.

---

[7] Some scholars have argued that religious liberty claims are distinctive and thus deserving of distinctive Constitutional treatment. *See generally* Michael W. McConnell, *The Problem of Singling Out Religion*, 50 DEPAUL L. REV. 1 (2000); Abner S. Greene, *The Political Balance of the Religion Clauses*, 102 YALE L. J. 1611 (1993). Such a view further supports distinguishing *Roman Catholic Diocese* and *Agudath Israel* from the present case.

[8] On February 5, 2021, the Supreme Court granted emergency injunctive relief to California churches against Governor Newsom's ban on indoor worship services. *See S. Bay United Pentecostal Church v. Newsom*, No. 20A136, 2021 WL 406258 (U.S. Feb. 5, 2021). The Court concludes that the same reasons for distinguishing *Roman Catholic Diocese* and *Agudath Israel* apply to this recent decision.

The Court acknowledges the (growing) chorus of doubts directed at *Jacobson*.  As Justice Gorsuch,[9] and many others, have noted, *Jacobson* is over 100 years old and predates many of the doctrinal developments in modern Constitutional law.  *Roman Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring); *Big Tyme Investments*, 2021 WL 118628, at *10 (5th Cir. Jan. 13, 2021) (Willet, J., concurring) ("*Jacobson* was decided 116 years ago. And I do not believe it supplies the standard by which courts in 2021 must assess emergency public health measures."); *Agudath Israel*, 983 F.3d at 635.  According to the Court, however, *Jacobson*'s modern reprise despite its old age only further underscores just how unprecedented the current pandemic is and the pressing need to grant state and local officials a wide berth as they "actively shap[e] their response to changing facts on the ground."  *South Bay*, 140 S. Ct. at 1613–14.  Thus because *Jacobson* provides a workable framework that balances the delicate considerations at play— responding to the COVID-19 crisis versus maintaining Constitutional liberties—it must govern this case.

To be sure, while the Court *defers* to state and local authorities, it does not wholly *abdicate* its judicial role.  *See Roman Catholic Diocese*, 141 S. Ct. at 74 (Kavanaugh, J., concurring) ("But judicial deference in an emergency or a crisis does not mean wholesale judicial abdication."); Lindsay F. Wiley & Stephen I. Vladeck*, Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review*, 133 HARV. L. REV. F. 179, 183

---

[9] In *Roman Catholic Diocese*, Justice Gorsuch concurred in the grant of temporary injunctive relief but wrote separately to explain his displeasure with district courts, such as this one, that applied the Constitution in a deferential way during the COVID-19 pandemic.  *Roman Catholic Diocese*, 141 S. Ct. at 71 (Gorsuch, J., concurring) ("Why have some mistaken this Court's modest decision in *Jacobson* for a towering authority that overshadows the Constitution during a pandemic?").  Because the rest of the justices did not join in Justice Gorsuch's opinion, this is additional evidence that a narrow reading of *Roman Catholic Diocese* is in order.

(2020).  As discussed below, the Court analyzes the Plaintiffs' claims under both the *Jacobson* framework as well as the traditional mode of Constitutional analysis.  However, because the claims cannot succeed under either approach, Plaintiffs' Preliminary Injunction motion must be denied.

**II.**    **Preliminary Injunction Standard**

Where, as here, an injunction "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."[10]  *Agudath Israel*, 983 F.3d at 631 (cleaned up); *see Murray v. Cuomo*, 460 F. Supp. 3d 430, 442 (S.D.N.Y. 2020).

**III.**   **Likelihood of Success**

In support of their motion for a Preliminary Injunction, the Plaintiffs claim that the Dining Policy violates (1) the Fourteenth Amendment's Due Process Clause; (2) the Dormant Commerce Clause; and (3) the First Amendment.  To prevail on these Constitutional claims under *Jacobson*, the Plaintiffs must show that the Dining Policy "has no real or substantial relation" to the public welfare and that it is "beyond all question, a plain, palpable invasion of

---

[10] Governor Cuomo contends that a heightened standard of proof on the Preliminary Injunction factors is warranted given that the Plaintiffs seek a mandatory injunction—injunctive relief that alters the status quo.  *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).  Under the mandatory injunction standard, the Plaintiffs would have to prove "a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (cleaned up).  It is unclear, however, whether the mandatory injunction standard applies in cases involving Constitutional challenges to COVID-19 restrictions.  *See Agudath Israel*, 983 F.3d at 631 (declining to apply heightened standard).  In any event, the Court need not decide this issue because even without the heightened standard, the Plaintiffs cannot prevail on their Preliminary Injunction application.

rights secured by fundamental law."  197 U.S. at 31.

Plaintiffs do not meet *Jacobson*'s standard.  The Dining Policy bears a relation to the public welfare by seeking to curb the transmission of COVID-19 in higher risk settings such as restaurants.  *See Columbus Ale*, 2020 WL 6118822, at *4; *Luke's Catering Serv., LLC v. Cuomo*, No. 20-CV-1086S, 2020 WL 5425008, at *7 (W.D.N.Y. Sept. 10, 2020).  Moreover, Plaintiffs have not shown that the Dining Policy is "beyond all question, a plain, palpable invasion of rights secured by fundamental law."  *Jacobson*, U.S. at 31.  On the contrary, their requested relief—50% of indoor dining and extension of the dining curfew to midnight—implicitly concedes that public health regulation of restaurants, in view of the pandemic, is constitutional. But because the constitutionality of the Dining Policy cannot turn on granular distinctions (such as two additional hours of dining service or a 50% increase in capacity limits), the Court concludes that the Plaintiffs' claims are unlikely to succeed under *Jacobson*.

Alternatively, even if the Court were to analyze the Plaintiffs' claims under a traditional Constitutional analysis, the same conclusion would obtain.

***Fourteenth Amendment Claim***:  Plaintiffs cannot make out a viable substantive or procedural due process claim under the Fourteenth Amendment.  *First*, it is black letter law that a person is not entitled to procedural due process protections against government action that is legislative in nature.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).  A government action is legislative if it has "general application" and looks to the future. *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994).  Here, the Dining Policy is clearly legislative as it applies generally to all restaurants across New York and New York City, and because it applies prospectively.  *Id.*  Thus Plaintiffs' procedural due process challenge fails.  *See Hund v. Cuomo*, No. 20-CV-1176 (JLS), 2020 WL 6699524, at *11

13

(W.D.N.Y. Nov. 13, 2020) (rejecting procedural due process challenge against Governor Cuomo's policy restricting live music in public).

     *Second*, Plaintiffs' substantive due process challenge is also likely to fail on the merits. The doctrine of substantive due process "protects individuals against two types of government action":  (1) action that shocks the conscience or (2) action that "interferes with rights implicit in the concept of ordered liberty."  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (cleaned up). At oral argument, the Court asked the Plaintiffs:  "What is so shocking about, in the middle of a pandemic, taking a public restaurant and saying, you can't be open?"  (Oral Arg. Tr. at 8.)  In response, the Plaintiffs alleged in conclusory fashion that the Dining Policy shocked the conscience because it went against the grain of scientific proof.  (*Id.* at 8–9.)  Such averments, however, simply do not satisfy the high bar that is the "shock the conscience" standard.  *Cf. Rochin v. California*, 342 U.S. 165, 172 (1952) (officers forcibly pumping suspect's stomach for morphine capsules found to "shock the conscience"); *Hefferan v. Corda*, 498 F. App'x 86, 89 (2d Cir. 2012) (stating that "arbitrary" and "outrageous" Government action satisfies shock the conscience standard).  In these circumstances, however, the Court cannot say that the Dining Policy shocks the conscience.

     Neither have Plaintiffs shown an interference with a fundamental right "implicit in the concept of ordered liberty" that would justify a heightened standard of review.  *Salerno*, 481 U.S. at 746; *United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 n. 4 (1938).  The liberty interest Plaintiffs assert is their right to transact business in their restaurants without restriction from the Dining Policy.  While this argument may have prevailed at an earlier time, the Supreme Court has, for nearly a century, consistently rejected economic liberties as constituting fundamental rights. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937) ("The

Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty."); *see also Williamson v. Lee Optical of Oklahoma Inc*., 348 U.S. 483, 488 (1955) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."); *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978); *Columbus Ale House*, 2020 WL 6118822, at *4.  In sum, Plaintiffs are unlikely to succeed on their claims under the Fourteenth Amendment.

**Dormant Commerce Clause Claim**:  The Court also finds Plaintiffs' Dormant Commerce Clause claim to be without merit.  The guiding principle behind the Dormant Commerce Clause is that the Constitution "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (cleaned up); *see Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009).  To prove a Dormant Commerce Clause violation, the Plaintiffs must show that the Dining Policy:

(1) clearly discriminates against interstate commerce in favor of intrastate commerce,

(2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or

(3) has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.

*Selevan*, 584 F.3d at 90 (cleaned up).

Plaintiffs are unlikely to succeed under any of these theories.  *First*, because the Dining Policy only applies to restaurants in New York and New York City, it neither "discriminates"

against interstate commerce nor has the "practical effect" of exerting "extraterritorial control" over it. *Id.*; *see Michigan Rest. & Lodging Ass'n v. Gordon*, No. 1:20-CV-1104, 2020 WL 6866649, at *3 (W.D. Mich. Nov. 20, 2020) (holding that Michigan Governor's COVID-19 restriction on restaurant dining did not violate Dormant Commerce Clause because "it does not close restaurants and bars beyond Michigan's borders"). *Second*, even assuming that the Dining Policy has imposed incidental burdens on interstate commerce—for example, on out-of-state restaurant suppliers or interstate travelers—the Plaintiffs have not shown that these burdens are "incommensurate" with the local benefit of mitigating further transmission of the COVID-19 virus. *See Selevan*, 584 F.3d at 80; *Plaza Motors*, 2021 WL 222121, at *7 (rejecting Dormant Commerce Clause challenge against Governor Cuomo's restrictions on automobile dealers); *Savage v. Mills*, No. 1:20-CV-00165-LEW, 2020 WL 4572314, at *6 (D. Me. Aug. 7, 2020) (rejecting Dormant Commerce Clause challenge to Maine's quarantine order). Therefore, Plaintiffs have not shown a likelihood of success on their Dormant Commerce Clause claim.

*First Amendment Claim*: Finally, the Plaintiffs' First Amendment freedom of assembly claim is also unlikely to succeed on the merits. The Supreme Court has stated that social associations—like the ones Plaintiffs complain about—do not come within the ambit of First Amendment protection.[11] *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("[W]e do not think the Constitution recognizes a generalized right of 'social association' that includes chance encounters in dance halls."); *see also Michaelidis v. Berry*, 502 F. App'x 94, 96 (2d Cir. 2012)

---

[11] The ostensible flaw with the Plaintiffs' First Amendment claim is that state and local governments have traditionally been allowed to regulate restaurants in accordance with their police powers. Just as they may promulgate regulations regarding health and sanitary standards, dietary caloric disclosures, number of patrons, and hours of operation, so too can they regulate public health standards in view of the COVID-19 pandemic. Therefore, the state's police powers would seem to apply *a fortiori* in the context of a global pandemic.

("Plaintiffs' relationships with their landlords, their restaurant customers, and their employees are not sufficiently intimate to implicate this [First Amendment] protection."); *H's Bar, LLC v. Berg*, No. 20-CV-1134-SMY, 2020 WL 6827964, at *4–5 (S.D. Ill. Nov. 21, 2020) (denying preliminary injunction against Illinois Governor's restaurant dining restrictions and rejecting right to assembly challenge); *Amato v. Elicker*, 460 F. Supp. 3d 202, 219 (D. Conn. 2020) (same).  Plaintiffs thus are unlikely to succeed on their First Amendment challenge.

   ***Rational Basis Review***:  Because none of the Plaintiffs' Constitutional claims are viable, the Court must apply rational basis review.  The Dining Policy undeniably passes rational basis scrutiny:  It is premised on a conceivable scientific basis that is rationally related to mitigating the further spread of the COVID-19 virus.  *Columbus Ale*, 2020 WL 6118822, at *3 n. 8; *see Reno v. Flores*, 507 U.S. 292, 306 (1993) ("Government action satisfies rational basis scrutiny if it "rationally advance[es] some legitimate government purpose").  The Court therefore concludes that even if *Jacobson* did not apply, a traditional Constitutional analysis would yield the same conclusion.

## IV. Irreparable Harm

   In addition to demonstrating the likelihood of success on the merits, the Plaintiffs must also show irreparable harm in the absence of a Preliminary Injunction.  Irreparable harm must be imminent and incapable of being cured by monetary remedies.  *See Shapiro v. Cadman Towers*, 51 F.3d 328, 332 (2d Cir. 1995).

   The Plaintiffs contend that the Dining Policy will lead to their businesses' demise and that this constitutes irreparable harm.  The Second Circuit has recognized that a "threat to the continued existence of a business can constitute irreparable injury."  *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 588 F.2d 24, 28 (2d Cir. 1978).  The problem here, however, is

that the Plaintiffs have not proffered any evidence on the record showing that their respective

establishments are imminently likely to shut down because of the Dining Policy.  *See id.* at 28

(requiring evidentiary support for claim that establishment "would go out of business").

In truth, Plaintiffs' real injuries in this case are the substantial losses in revenue caused by

the COVID-19 pandemic and its accompanying restrictions.  As the majority of New Yorkers

decide to play it safe and dine at home during the pandemic, restaurants across the state—and

especially in New York City—have had to endure substantial losses in revenue.  These injuries

are palpable; their significance is not lost on this Court.  But as it pertains to the law, the

Plaintiffs' injuries constitute monetary damages, which are not grounds for a Preliminary

Injunction.  *See Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir.

2003) ("[O]nly harm shown to be non-compensable in terms of money damages provides the

basis for awarding injunctive relief.").  Therefore, the irreparable harm factor weighs against a

Preliminary Injunction.

## V.    Public Interest

The final Preliminary Injunction factor is the public interest.  The Supreme Court has

recognized that, "Stemming the spread of COVID-19 is unquestionably a compelling interest."

*Roman Catholic Diocese*, 141 S. Ct. at 67.  The question here is whether the Dining Policy

effectuates that compelling interest.  It does.  Therefore, the public interest factor weighs against

the issuance of a Preliminary Injunction.

The Plaintiffs concede that Governor Cuomo's evidentiary submission—Dr. Debra

Blog's affidavit—is true.[12]  (Oral Arg. Tr. at 20.)  However, they contend that Dr. Blog's

---

[12] Following oral argument, Plaintiffs attempted to discredit Dr. Blog's testimony in
supplemental filings before the Court.  (*See* Pls.' Supp. Br. at 10–15, ECF 45.)  Because
Plaintiffs adopted the entirety of Dr. Blog's affidavit as their own during oral argument, (Oral

testimony lends support for their Preliminary Injunction application because none of the indoor dining risks she mentions applies to their restaurants.  (*Id.* at 20–21; Pls.' Reply at 2–4.) According to the Plaintiffs, their establishments have been outfitted with state-of-the-art ventilation systems that mitigate the spread of COVID-19.  (Khatibi Decl. ¶ 5, ECF 19; Pls.' Reply at 4.)  Thus because dining at their establishments is safer than social gatherings at private homes, they contend that a Preliminary Injunction is in the public's interest.

The Court is unpersuaded by this argument for two reasons.  *First*, Plaintiffs have not submitted any evidence, besides their own assurances, that demonstrates the efficacy of their ventilation systems.[13]  Moreover, their theory that reopening restaurants will save lives by averting indoor social gatherings is similarly lacking in evidentiary support.  While it may be true that private social gatherings currently account for a major source of transmission, the Plaintiffs have offered little evidence suggesting that re-opening indoor dining will *directly decrease* such gatherings.[14]  (*See* Pls.' Supp. Br. at 16, ECF 45) ("There is no data or information

---

Arg. Tr. at 20), these arguments must be set aside.  Moreover, upon reviewing Dr. Blog's deposition transcripts, the Court concludes that nothing in her testimony contradicts her original affidavit submitted to the Court.

[13] To demonstrate the effectiveness of their ventilation systems, the Plaintiffs cite a scientific report from another court proceeding that purports to show "air exchange in indoor dining venues in the Western New York Area." (Pls.' Supp. Br. at 17–18.)  Because the study was conducted in a different part of the state (western New York) and did not analyze Plaintiffs' specific venues, the evidence is inapposite.

[14] The Plaintiffs argue that when restaurants are closed, the "logical assumption" is that people "retreat to their homes" where they contribute to the transmission of the virus.  (Pls. Supp. Br. at 16.)  And they argue that "when indoor dining is closed, the spread of virus has gone up." (*Id.*) This argument is not based on scientific fact, but on speculative deductive reasoning.  The rise in COVID-19 infections, during periods of restaurant closures, is affected by a multiplicity of factors.  (Blog Dep. Tr. 37: 17–19, ECF 45-3.)  Accordingly, it is conjecture to claim that closing restaurant dining is the sole—or substantial—cause of increasing COVID-19 infections.

that defines what people do when restaurants are closed.")

*Second*, even assuming that Dr. Blog's affidavit is consistent with the injunctive relief sought by the Plaintiffs, the ultimate arbiter of public health in New York is Governor Cuomo, not Dr. Blog.  And here, Governor Cuomo has made the deliberate decision to take sweeping measures in response to a second surge of infections across the state.  His policies may be subject to "reasonable disagreement"; however, the "Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the State to guard and protect." *South Bay*, 140 S. Ct. at 1613.  Accordingly, the Court cannot quarterback the state's response to the COVID-19 pandemic from the bench.

In the end, the Court finds the public interest factor to tip heavily towards denying the Preliminary Injunction motion.  As noted above, the lives lost to the pandemic are legion.  *See supra* at 2.  Many of these deaths have been suffered by those most vulnerable in our society: the elderly and the infirm.  And in addition to the costs to human life, the pandemic has affected how people live and work, and how they interact with loved ones—in short, everything that makes life worth living.

To preserve the public health and mitigate further needless death, Governor Cuomo took drastic steps aimed at stopping the spread of the COVID-19 virus.  He was entitled to take these measures pursuant to the police powers delegated to the legislative and executive branches.  As Justice Kagan recently noted, the judiciary must not inject "uncertainty into an area where uncertainty has human costs."  *S. Bay United Pentecostal Church v. Newsom*, No. 20A136, 2021 WL 406258, at *6 (U.S. Feb. 5, 2021) (Kagan, J., dissenting).  Accordingly, because principles of federalism, separation of powers, and judicial modesty demand that the Court respect Governor Cuomo's policy decision, the motion for a Preliminary Injunction must be denied.

## <u>CONCLUSION</u>

The motion for a Preliminary Injunction is **DENIED**.  The Clerk of Court is directed to terminate the motion at ECF 16.

Governor Cuomo and the City Defendants are directed to respond to the Complaint pursuant to this Court's order entered on February 3, 2021.


Dated: New York, New York           SO ORDERED
February 9, 2021
                                    _____
                                    HONORABLE PAUL A. CROTTY
                                    UNITED STATES DISTRICT JUDGE